Margret REY, Plaintiff, Appellee,

v.

Richard G.D. LAFFERTY, et al.,
Defendants, Appellants.

Margret REY, Plaintiff, Appellant,

v.

Richard G.D. LAFFERTY, et al.,
Defendants, Appellees.

Nos. 92–1139, 92–1177.

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1992.

Decided March 30, 1993.

H. Joseph Hameline with whom Andrea M. Fish and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, were on brief, for appellee Rey.

Charles Donelan with whom Katherine E. Perrelli, Kristen G. McGurn and Day, Berry & Howard, Boston, MA, were on brief, for appellants Lafferty, et al.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Margret Rey, who owns the copyright to the "Curious George" children's books, challenges an award of damages to Lafferty Harwood & Partners ("LHP") for Rey's withholding of approval of various ancillary products utilizing the "Curious George" character under their 1983 licensing agreement. LHP appeals the district court order awarding Rey damages and future royalties on certain other "Curious George" products. We affirm in part and reverse in part.

## I

### BACKGROUND

"Curious George" is an imaginary monkey whose antics are chronicled in seven books, written by Margret and H.A. Rey, which have entertained readers since the 1940s. A mischievous personality consistently lands Curious George in amusing scrapes and predicaments. The more recent "monkey business"—leading to the present litigation—began in 1977 when Margret Rey granted Milktrain Productions an option to produce and televise 104 animated "Curious George" film episodes. The option agreement was contingent on Milktrain's obtaining financing for the film project, and adverted to a *potential* agreement to license "ancillary products," based on the "Curious George" character, once the 104 film episodes had been completed.

### A. *The Original Film Agreements.*

Milktrain approached LHP, a Canadian investment firm, to obtain financing for the project. LHP agreed to fund the venture by selling shares in the project to investors (hereinafter: the "Milktrain Agreement"); LHP and its investors were to divide a 50% share of Milktrain's profits on the films and on any future ancillary products.

With the financing commitment in place, Rey granted Milktrain and LHP a limited license "to produce (within a two-year period from the date of exercise) one hundred and four (104) four minute film episodes based on the ["Curious George"] character solely for broadcast on television" (hereinafter: the "Rey License"). Rey was to receive a fee for assisting with the editing and production of the episodes, and an additional royalty amounting to 10% of the revenues from any film telecasts. The Rey License made no mention of ancillary product rights. Nevertheless, LHP promoted the project to investors through a prospectus (hereinafter: the "1978 Private Placement Memorandum") which represented, *inter alia*, that "the production contract [with Rey] gives LHP the right to participate in the financing of ... the option ... to undertake the exploitation of other rights to 'Curious George' including manufacturing, food, licensing and other commercial areas of exploitation."

### B. *The Revised Agreements.*

The film project soon encountered delays and financial setbacks. By early 1979, though only 32 of the 104 episodes had been completed, the original investment funds had been virtually exhausted. In order to rescue the project and complete the films to Rey's satisfaction, LHP offered to arrange additional financing. In consideration, LHP insisted that the Milktrain Agreement be revised to permit LHP to assume control of the film production process and to receive higher royalties on the completed episodes. Milktrain assented to these revisions, and the revised Milktrain Agreement (hereinafter: the "Revised Milktrain Agreement" or "RMA") was signed on November 5, 1979.

As prelude to its description of the new obligations between Milktrain and LHP, the RMA recited that Milktrain and LHP owned "the rights to Curious George which have been obtained from ... Rey" under the Rey License. The RMA further stated that:

> Investors acquiring the episodes shall acquire all right, title and interest therein, without limitation or reserve, including the original negative....
>
> LHP shall have the right to participate on an equal basis with [Milktrain] in their right of first refusal after the present agency rights expire to undertake the exploitation of other rights to Curious George, including manufacturing, food, licensing and the publication of the 104 episodes in book form ... in accordance with the rights granted to [Milktrain] and LHP [by Rey] in [the Revised Rey License].[1]

Simultaneously with the negotiation of the RMA, LHP proposed several changes in the Rey License, including language which would have granted LHP the immediate right to "undertake the exploitation of other rights to 'Curious George,' including manufacturing, food, licensing and the publication of the 104 episodes in book form." Rey rejected the LHP proposal in a letter to Richard G.D. Lafferty (president and C.E.O. of LHP): "I have repeatedly stated to Milktrain and to you that I will not consider negotiating such rights before the films are done." Rey did consent, however, to certain changes to the royalty arrangements, whereby Rey would receive a 10% share of film revenues only "after the investors have recouped [their investment] and certain soft dollar commitments ... have been paid."

On November 5, 1979, concurrently with the execution of the Revised Milktrain Agreement, a revised version of the Rey License (hereinafter: the "Revised Rey License" or "RRL") was executed, incorporating these changes, and superseding the original Rey License. The RRL recited that the original Rey License had granted Milktrain and LHP the right to produce and distribute animated "Curious George" films "for television viewing," but made no mention of the "ancillary product" rights unsuccessfully sought by LHP.

As agreed, LHP undertook to arrange further financing to complete the film project. On November 23, 1979, LHP released another prospectus (hereinafter: the "1979 Private Placement Memorandum") to which it attached the Revised Milktrain Agreement. The 1979 Private Placement Memorandum again stressed the prospect of eventual revenues from ancillary products but noted that these rights "have yet to be negotiated" with Rey.

## C. The Ancillary Products Agreement.

Production of the 104 TV episodes was completed in 1982. On January 3, 1983, an Ancillary Products Agreement (or "APA") was signed by Rey and LHP, granting LHP a general right to license "Curious George" in spin-off ("ancillary") products for a renewable term of five years. The APA defined "ancillary products" as:

> All tangible goods ... excluding books, films, tapes, records, or video productions.... However, for stories already owned by [LHP] and which have been produced as 104 episodes under the license granted in the January, 1978 agreement and the November 5, 1979 revision of that agreement, [LHP] shall have the right to produce books, films, tapes, records and video productions of these episodes under this Agreement, subject to [Rey's] prior approval ... which prior approval shall not be unreasonably withheld.

In return for these rights, Rey was to receive one-third of the royalties on the licensed products, with certain minimum annual payments guaranteed. Rey retained the right to disapprove *any product*, and to propose changes which would make a disapproved product acceptable to her. The APA provided, *inter alia*, that Rey's approval would not be withheld "unreasonably."

---

1. Shortly thereafter, Milktrain apparently assigned its share of ancillary product licensing rights to LHP, leaving LHP the sole owner of these rights.

### D. *The Houghton Mifflin Contract.*

Following the execution of the Ancillary Products Agreement, LHP assigned its licensing rights to a new subsidiary, Curgeo Enterprises, which turned its attention to licensing the "Curious George" character in various product forms.[2] On March 27, 1984, Curgeo executed a contract with Houghton Mifflin Company to publish the 104 television film episodes in the form of a children's book series. The contract provided that Houghton Mifflin would publish at least four books, with illustrations drawn directly from the film negatives, in each year from 1984 through 1987; the contract was renewable for an additional five-year term if LHP and Rey agreed to extend the APA beyond 1987. Pursuant to the contract, Houghton Mifflin published four books each year from 1984 through 1987.

In 1987, LHP notified Houghton Mifflin that it had declined to extend the APA, but that Curgeo had "entered into a new operating agreement which permits us to continue to act in the capacity in which we have been acting for the last five years.... [Y]ou are free to pick up your option to renew." In response, Houghton Mifflin extended its contract for the additional five-year term, publishing an additional four books in 1988 and again in 1989. It ceased publication of the book series in 1990, when Rey advised that the APA had been cancelled.

### E. *Other Product Licenses.*

Curgeo moved aggressively to license the "Curious George" character in other product areas as well. Beginning in 1983, the "Curious George" TV episodes were licensed to Sony Corporation, which transferred the images from the television film negatives to videotape. LHP takes the position that the Sony video license was entered pursuant to the RRL; Rey claims it is subject to the APA. *See supra* at p. 1382.

In 1983, Curgeo licensed "Curious George" to Eden Toys Inc., which proposed to market a "Curious George" plush toy. In the beginning, Rey rejected Eden's proposed designs for the toy, but Eden eventually proposed several versions which were acceptable to Rey. The plush toy was marketed from 1983 to 1990, but experienced poor sales and generated less revenue than expected. Eden blamed the poor market performance on Rey's alterations to Eden's original design proposals.

In 1987, Curgeo received a commitment from Sears, Roebuck to market "Curious George" pajamas through the Sears catalog. The Sears pajama project promised high returns, but catalog deadlines necessitated immediate approval of a product design. Glen Konkle, Curgeo's agent, brought Rey a prototype pajama and a flat paper sketch of "Curious George" which had been proposed as the basis for the final pattern. Rey rejected the proposal, complaining that the pajama material was "hard, ugly [and] bright yellow," and that the sketch of "Curious George" was "plump" and "not recognizable." The catalog deadline passed and the pajama manufacturers withdrew their bids. In addition, Beach Paper Products, which had orally agreed to license "Curious George" for a line of paper novelties, withdrew its offer after learning that "Curious George" products would not receive exposure in the Sears catalog.

In 1988, Curgeo licensed "Curious George" to DLM Inc., which intended to use the "Curious George" character in a trilogy of educational software. Rey approved the software in principle, and production began in July 1988. In August 1988, however, DLM withdrew its plans to complete the "trilogy" after Rey telephoned DLM's project director and harshly criticized the design of the first software product and the accompanying manual developed by DLM.

**2.** Curgeo Enterprises is not named in the Rey complaint; Curgeo Agencies Inc. and Curgeo Overseas, Inc., are named as defendants. We refer to the three entities collectively as "Curgeo."

### F. *The Ancillary Products Agreement Renewal.*

Due in part to these product rejections, LHP earned less money than it anticipated from ancillary products. When the APA came up for renewal in January 1988, LHP declined to exercise its option for an additional five-year term. Instead, the parties agreed to renew on a month-to-month basis, terminable by either party on one month's notice. Rey's royalty rate was increased to 50% (effective January 3, 1988), but with no guaranteed minimum payment. On April 10, 1989, Rey terminated the APA. LHP responded by advising that Curgeo would "continue to administer those licenses which [remained] outstanding and report to you from time to time accordingly." LHP thereupon continued to market the Sony videos and to publish the television films in book form under the Houghton Mifflin agreements.

### G. *"Curious George" Goes to Court.*

On February 8, 1991, Rey filed suit against Lafferty, Curgeo and LHP, in connection with LHP's continuing, allegedly unauthorized production of the Houghton Mifflin books and Sony videos. Rey's complaint alleged violations of federal copyright, trademark and unfair-competition statutes, breach of contract, and violations of Mass.Gen.L. ch. 93A ("chapter 93A"); it sought to enjoin further violations and to recover unpaid royalties on the books and videos. LHP countersued, claiming that Rey unreasonably had withheld approval of various products while the APA remained in force. The LHP complaint alleged breach of contract, interference with contractual and advantageous business relationships, and violation of chapter 93A.

After a four-day bench trial, the district court found for Rey on her claims for breach of contract, ruling that the book and video licenses were governed by the APA and that Rey was entitled to recover $256,327 in royalties. The court found for LHP on several LHP counterclaims, however, holding that Rey unreasonably had withheld approval of, *inter alia,* the Sears pajamas, the DLM software, and Eden's original plush toy design. LHP was awarded $317,000, representing lost profits and consequential damages resulting from Rey's rejection of these products.

## II

### DISCUSSION

"Under Massachusetts law, the 'interpretation of a contract is ordinarily a question of law for the court'." *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir.1992) (quoting *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir. 1981)); *see also, e.g., Lawrence–Lynch Corp. v. Department of Environmental Mgmt.,* 392 Mass. 681, 682, 467 N.E.2d 838, 840 (1984); *Sparks v. Microwave Associates, Inc.,* 359 Mass. 597, 600, 270 N.E.2d 909, 911 (1971).[3] Only if the contract is ambiguous will there arise issues of fact reviewable for clear error. *See Dwek,* 970 F.2d at 993; *see also ITT Corp. v. LTX Corp.,* 926 F.2d 1258 (1st Cir.1991); *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989) (New York law). "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken," *K Mart,* 892 F.2d at 1083 (citing *In re*

---

**3.** The Rey License and RRL contain choice-of-law provisions providing for the application of New York law, and the Milktrain Agreement and RMA contain choice-of-law provisions providing for the application of the law of the Province of Quebec, Canada. Neither party alludes to these contractual provisions in their briefs, however, and both parties appear to have premised their trial presentations and appellate briefs on the application of Massachusetts law. In accordance with their choice, and since a "reasonable relation" exists between their con-

tract and the Massachusetts forum, *see Carey v. Bahama Cruise Lines,* 864 F.2d 201, 206 (1st Cir.1988), we apply Massachusetts law. *See Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991) ("[w]here ... the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forego independent analysis and accept the parties' agreement"); *accord Doherty v. Doherty Ins. Agency, Inc.,* 878 F.2d 546, 547 (1st Cir.1989); *Moores v. Greenberg,* 834 F.2d 1105, 1107 n. 2 (1st Cir.1987).

*Navigation Technology Corp.,* 880 F.2d 1491, 1495 (1st Cir.1989)). The ambiguity determination itself is subject to plenary review, *id.,* and parol evidence may not be used to "create ambiguity where none otherwise exists." *See Boston Car Co. v. Acura Auto. Div.,* 971 F.2d 811, 815 (1st Cir.1992) (citing *ITT Corp.,* 926 F.2d at 1261).

## A. *The Book/Video Claims.*

The Rey complaint alleged that LHP's only right to publish the "Curious George" TV episodes in book and video form derived from the Ancillary Products Agreement, was subject to the APA's royalty provisions, and expired when Rey terminated the APA in 1989. LHP responds that the book and video rights to the TV episodes were governed by the parties' other agreements, specifically the Revised Rey License, which (according to LHP) incorporated the Revised Milktrain Agreement. According to LHP, these other agreements continued in effect notwithstanding termination of the APA; moreover, these agreements provided that no royalties were due Rey before LHP's investors recovered their investment in the 104 TV films.[4] The district court accepted the interpretation urged by Rey, based on the language of the various contracts and the circumstances surrounding their execution. We agree.

### 1. *The Houghton Mifflin Books.*

The Ancillary Products Agreement provided, *inter alia,* that

> for stories already owned by [LHP] ... which have been produced as 104 episodes under the license granted in the January, 1978 agreement and the November 5, 1979 revision of that agreement, [LHP] shall have the right to produce *books,* films, tapes, records and *video productions* of these episodes *under this Agreement,* subject to [Rey's] prior approval ...

---

4. LHP contends that $250,000 (U.S.) had yet to be recovered by the investors at the time the

(Emphasis added.) Throughout the document the term "this Agreement," utilizing the capital letter "A", refers to the APA. Thus, the plain language of the operative provision clearly contemplates that the APA was to govern the licensing of any books and "video productions" arising from the 104 films. *See Barilaro v. Consolidated Rail Corp.,* 876 F.2d 260, 265 n. 10 (1st Cir.1989) ("it is ... 'a general rule in the construction of a written instrument that the same word occurring more than once is to be given the same meaning unless a different meaning is demanded by the context.'") (quoting *Dana v. Wildey Sav. Bank,* 294 Mass. 462, 466, 2 N.E.2d 450, 453 (1936)).

LHP argues, nonetheless, that a narrow meaning must be ascribed to the quoted APA language, insofar as the RMA purported to grant investors "all right, title and interest [to the 104 film episodes], without limitation or reserve, including the original negative." The problem with LHP's argument is that Rey never signed the RMA. LHP concedes this, but argues that the RMA and RRL were negotiated and executed simultaneously by LHP, and must be interpreted *in pari materia. See, e.g., Interstate Commerce Comm'n v. Holmes,* 983 F.2d 1122, 1126–1127 (1st Cir. 1993) (escrow agreement and consent decree read together, as "synergistic" documents); *accord Chelsea Indus., Inc. v. Florence,* 358 Mass. 50, 55–56, 260 N.E.2d 732 (1970); *Thomas v. Christensen,* 12 Mass.App.Ct. 169, 422 N.E.2d 472, 476 (1981). The Massachusetts courts sometimes have held that the party to be bound need not have signed each component part of an integrated agreement where it is the "sense" of the transaction, as supported by reliable indicia in the writings which were signed by the party to be bound, that a unitary transaction was contemplated by the parties. *See Chase Commercial Corp. v. Owen,* 32 Mass.App.Ct. 248, 588 N.E.2d 705 (1992) (holding that non-signatory guarantor was bound by jury trial waiver contained in loan and security agreements,

present action was commenced.

though guarantee agreement contained no such waiver, where "the three documents were part of one transaction"); *see also Gilmore v. Century Bank & Trust Co.*, 20 Mass.App.Ct. 49, 50, 477 N.E.2d 1069, 1073 (1985) (holding that non-signatory trustee could recover for breach of workout agreement, even though not a party to its terms, based on "sense" of agreement, and "such factors as simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdependency of provisions"). On this theory, LHP contends, Rey's signature on the RRL bound her to the language of the RMA, and authorized LHP to transfer the television episodes to book form, using available technology.

■ However, where contract language contains no unambiguous indicia of the parties' mutual intent to enter into a unitary transaction, we review for "clear error" the fact-dominant determination whether their separate documents were intended by the parties as an integrated agreement. *Interstate Commerce Comm'n v. Holmes*, 983 F.2d at 1126–1127; *Holmes Realty Trust v. Granite City Storage Co.*, 25 Mass.App.Ct. 272, 517 N.E.2d 502, 504 (1988) ("it would be *open to a fact finder* ... to treat [separate documents] as intended by the parties to be parts of a single transaction") (emphasis added); *Fred S. James & Co. v. Hoffmann*, 24 Mass.App.Ct. 160, 163, 507 N.E.2d 269, 271 (1987).

■ In the present case, we find no "clear error" in the district court's determination that the parties contemplated *separate* (though related) transactions for film rights and financing. The evidence cut both ways. On the one hand, the RMA and the RRL were executed at approximately the same time, with some overlap in their internal references and subject matter. On the other hand, their respective provisions are less in unison than parallel.[5] Most importantly, the written and circumstantial indicia sharply contradict any suggestion of a meeting of the minds relating to the licensing of ancillary products. Rey did not participate in negotiating the RMA, did not sign it, was never made a party to its terms, and *expressly refused, during the RRL negotiations, to license "Curious George" for the "ancillary" purposes now urged by LHP. See supra* at p. 1382. Moreover, the 1979 Private Placement Memorandum prepared by LHP acknowledges Rey's nonacceptance by attaching the RRL as an exhibit and noting that ancillary product rights "have yet to be negotiated" with Rey. Finally, the parties' intention to exclude the Houghton Mifflin books from the RRL, and their intention to cover them in the APA, are corroborated by their subsequent course of dealing: among other things, the record shows that LHP paid Rey royalties on the books and videos on several occasions *at the 33% rate required under the APA*, rather than the 10% rate prescribed by the RRL, and that Curgeo expressly keyed the dates of the Houghton Mifflin contract *to the term (and anticipated renewal term) of the Ancillary Products Agreement:*

> By September 30, 1987, Curgeo [will] inform [Houghton Mifflin] in writing as to whether Curgeo has exercised its option to exploit the character "Curious George" through December 31, 1993 and, if Curgeo has exercised said option, Curgeo shall give the Publisher the option to extend this Agreement through December 31, 1993.

It was for the district court to balance the evidence in the first instance, *see Holmes Realty Trust*, 517 N.E.2d at 504, and we discern no sound reason to disagree with its findings, particularly on "clear error" review. *See Interstate Commerce*

---

**5.** Even if the RMA and RRL were jointly construed, their language might point away from the interpretation urged by LHP. Section 2(i) of the RMA granted LHP's investors "all right, title and interest" in the 104 T.V. episodes, "without limitation or reserve," but § 1(a) tempered this grant by defining the rights as "described herein, and set forth in Schedule 'A' [the RRL]." This language suggests that the "right,

title, and interest" language of the RMA was meant only to *confirm* and *restate*, and not to expand upon, the RRL's parallel, but more limited, grant of rights. *Cf. Fred S. James & Co.*, 24 Mass.App.Ct. at 164, 507 N.E.2d at 272 (finding no conflict between simultaneously executed instruments, where their language and the extrinsic evidence suggested independent obligations arising from simultaneous contracts).

*Comm'n v. Holmes,* 983 F.2d at 1127 (citing *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir.1990)) (even if proffered interpretation did "[give] rise ... to another plausible view of the evidence," reversal not warranted on "clear error" review).[6]

To sum up: Since the district court supportably found that the RRL and the RMA are separate, though related, agreements, the RMA's purported grant of rights did not bind Rey, who was bound only by the grant of rights she endorsed in the RRL and APA. The RRL contained no grant of rights to produce the Houghton Mifflin books, and the APA, which granted the right "to produce books ... of these episodes," obligated LHP to pay Rey royalties on the books without regard to whether LHP's investors had recouped their investment on the television film project. Thus, the district court did not err in finding that LHP's withholding of the Houghton Mifflin book royalties was wrongful, and we affirm its ruling on this point.

### 2. *The Sony Videos.*

■ LHP's claim to the Sony video royalties is more complicated: assuming the videos were not covered by the contractual clause in the RMA, *see supra* Part II.A.1., might they nonetheless have been covered by the grant of rights in the RRL, which licensed LHP to produce the 104 episodes *"for television viewing"*? The district court thought not: the parties' "reference to television viewing ... in a licensing agreement ... does not include [video technology] ... which probably was not in existence at the time that the rights were given."

### a. *"New Uses" and Copyright Law.*

For purposes of the present appeal, we accept the uncontested district court finding that the relevant video technology "was not in existence at the time that the rights" were granted under the RRL in January 1979. Consequently, it must be inferred that the parties did not specifically contemplate television "viewing" of the "Curious George" films in videocassette form at the time the RRL was signed. Such absence of specific intent typifies cases which address "new uses" of licensed materials, *i.e.,* novel technological developments which generate unforeseen applications for a previously licensed work. *See* Melville B. Nimmer and David Nimmer, 3 *Nimmer on Copyright* § 10.10[B] at 10–85 (1992) (*"Nimmer"*) ("the ... fact that we are most often dealing with a later developed technological process (even if it were known in some form at the time of execution) suggests that the parties' ambiguous phraseology masks an absence of intent rather than a hidden intent which the court simply must 'find' ").

Normally, in such situations, the courts have sought at the outset to identify any indicia of a mutual *general* intent to apportion rights to "new uses," insofar as such general intent can be discerned from the language of the license, the surrounding circumstances, and trade usage. *See, e.g., Murphy v. Warner Bros. Pictures, Inc.,* 112 F.2d 746, 748 (9th Cir.1940) (grant of "complete and entire" motion picture rights to licensed work held to encompass later-developed sound motion picture technology); *Filmvideo Releasing Corp. v. Hastings,* 446 F.Supp. 725 (S.D.N.Y.1978) (author's explicit retention of "all" television rights to licensed work, in grant of motion picture rights predating technological ad-

---

**6.** We reject LHP's further contention that Rey's failure to protest publication of the four Houghton Mifflin books in 1990 estops her from cancelling the book and video contracts under the APA. Where more than one inference fairly may be drawn from the evidence and an estoppel ruling turns on an issue of fact, we review for clear error. *United States v. Marin,* 651 F.2d 24, 29 (1st Cir.1981); *Morgan Guaranty Trust Co. v. Third Nat'l Bank,* 529 F.2d 1141, 1144 (1st Cir.1976). In our view, Rey's conduct does not require an inference that she acquiesced in the publication of these books under the APA. Rather, Rey protested the publication of the four books by filing suit shortly after realizing the unauthorized nature of Houghton Mifflin's continued publication. The district court apparently found that Rey's one-year delay, dating from the first unauthorized publication until the filing of Rey's suit for injunctive relief, was not "unreasonable" in the circumstances, and we decline to disturb its findings on this issue.

vances permitting movies to be shown on television, included retention of right to show motion picture on television). Where no reliable indicia of *general* intent are discernible, however, courts have resorted to one of several interpretive methods to resolve the issue on policy grounds.

Under the "preferred" method, *see* 3 *Nimmer* at 10–85, recently cited with approval in *SAPC, Inc. v. Lotus Development Corp.*, 921 F.2d 360, 363 (1st Cir. 1990), the court will conclude, absent contrary indicia of the parties' intent, that "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." 3 *Nimmer* at 10–86. Under this interpretive method, the courts will presume that at least the possibility of nonspecific "new uses" was foreseeable by the contracting parties at the time the licensing agreement was drafted; accordingly, the burden and risk of drafting licenses whose language anticipates the possibility of any particular "new use" are apportioned equally between licensor and licensee. *See, e.g., Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968) ("[i]f the words [of the license] are broad enough to cover the new use, ... the burden of framing and negotiating an exception should fall on the grantor" of the licensed rights).

An alternative interpretive method is to assume that

> a license of rights in a given medium (*e.g.*, 'motion picture rights') includes only such uses as fall within the unambiguous core meaning of the term ... and excludes any uses which lie within the ambiguous penumbra (*e.g.*, exhibition of motion picture film on television). Thus any rights not expressly (in this case meaning unambiguously) granted are reserved.

*See* 3 *Nimmer* at 10–85; *see also Bourne Co. v. Walt Disney Co.*, 1992 Copyr.L.Rep. (CCH) ¶ 26,934, 1992 WL 170686 (S.D.N.Y.

1992) ("if the disputed use was not invented when the parties signed their agreement, that use is not permitted under the contract"). This method is intended to prevent licensees from "'reap[ing] the entire windfall' associated with the new medium," *Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir.1988) (quoting Neil S. Nagano, Comment, *Past Software Licenses and the New Video Software Medium*, 29 U.C.L.A.L.Rev. 1160, 1184 (1982)), and is particularly appropriate in situations which involve overreaching or exploitation of unequal bargaining power by a licensee in negotiating the contract. *See, e.g., Bartsch*, 391 F.2d at 154 & n. 2 (citing *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481 (3d Cir.1956) (suggesting narrow construction where licensor was not "an experienced businessman" and had no "reason to know of the ... potential" for new uses at the time he signed the relevant agreement)). It may also be appropriate where a particular "new use" was completely unforeseeable and therefore *could not possibly* have formed part of the bargain between the parties at the time of the original grant. *Cohen*, 845 F.2d at 854; *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1993). Obviously, this method may be less appropriate in arm's-length transactions between sophisticated parties involving foreseeable technological developments; in such situations, narrow construction of license grants may afford an unjustifiable windfall to the licensor, who would retain blanket rights to analogous "new uses" of copyright material notwithstanding the breadth of the bargained-for grant. *See generally* 3 *Nimmer* at 10–85 ("it is surely more arbitrary and unjust to put the onus on the licensee by holding that he should have obtained a further clarification of a meaning which was already present than it is to hold that the licensor should have negated a meaning which the licensee might then or thereafter rely upon.").[7]

---

**7.** The problem becomes particularly acute when the analogous technology develops so rapidly as to supplant the originally contemplated application of the licensed work, rendering the parties' original bargain obsolete. Thus, for example, broad grants of "motion picture rights," made before technological advances permitted the combination of moving images with *sound*, later were held, typically, to encompass the rights to sound motion picture technology; a narrower

### b. *Video Technology as "New Use".*

These fine-tuned interpretive methods have led to divergent results in cases considering the extension of television rights to new video forms. Thus, for example, in *Rooney v. Columbia Pictures Industries, Inc.,* 538 F.Supp. 211 (S.D.N.Y.), *aff'd,* 714 F.2d 117 (2d Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983), the court determined that a series of contracts granting motion picture distributors a general license to exhibit plaintiffs' films "by any present *or future* methods or means" and "by any means *now known or unknown*" fairly encompassed the right to distribute the films by means of later-developed video technology.

> The contracts in question gave defendants extremely broad rights in the distribution and exhibition of pre-1960 films, *plainly intending* that such rights would be without limitation unless otherwise specified and further indicating that future technological advances in methods of reproduction, transmission and exhibition would inure to the benefit of defendants.

(Emphasis added.) Similarly, in *Platinum Record Co. v. Lucasfilm, Ltd.,* 566 F.Supp. 226, 227 (D.N.J.1983), the court held that videocassette rights were encompassed by a broad synchronization license to "exhibit, distribute, exploit, market, and perform [a motion picture containing licensed musical composition] ... perpetually throughout the world by any means or methods now or hereafter known." Again, the court rested its holding on the "extremely broad and completely unambiguous" contractual grant of *general* rights to applications of future technologies, which was held to "preclude[ ] any need in the Agreement for an exhaustive list of specific potential uses of the film." *Id.*

By contrast, in *Cohen,* 845 F.2d at 853–54, the Ninth Circuit concluded that a 1969 contract granting rights to "[t]he exhibition of [a] motion picture [containing a licensed work] ... *by means of television,*" but

containing a broad restriction reserving to the licensor "all rights and uses in and to said musical composition, except those herein granted," *did not* encompass the right to revenues derived from sales of the film in videocassette form. After deciding that "[t]he general tenor of the [contract] section [in which the granting clause was found] contemplate[d] some sort of *broadcasting or centralized distribution,* not distribution by sale or rental of individual copies to the general public," *see id.* at 853 (emphasis added), the court stressed that the playing of videocassettes, with their greater viewer control and decentralized access on an individual basis, did not constitute "exhibition" in the sense contemplated by the contract.

> Though videocassettes may be exhibited by using a television monitor, it does not follow that, for copyright purposes, playing videocassettes constitutes "exhibition by television." ... Television requires an intermediary network, station, or cable to send the television signals into consumers' homes. The menu of entertainment appearing on television is controlled entirely by the intermediary and, thus, the consumer's selection is limited to what is available on various channels. Moreover, equipped merely with a conventional television set, a consumer has no means of capturing any part of the television display; when the program is over it vanishes, and the consumer is powerless to replay it. Because they originate outside the home, television signals are ephemeral and beyond the viewer's grasp.
>
> Videocassettes, of course, allow viewing of a markedly different nature.... By their very essence, ... videocassettes liberate viewers from the constraints otherwise inherent in television, and eliminate the involvement of an intermediary, such as a network.
>
> Television and videocassette display thus have very little in common besides the fact that a conventional monitor of a television set may be used both to re-

---

holding would have left the original license virtually worthless, despite its broad language, and would have provided the licensor with an unde-

served windfall. *See, e.g., Murphy,* 112 F.2d at 748; *L.C. Page & Co. v. Fox Film Corp.,* 83 F.2d 196 (2d Cir.1936).

ceive television signals and to exhibit a videocassette. It is in light of this fact that Paramount argues that VCRs are equivalent to "exhibition by means of television." Yet, even that assertion is flawed. Playing a videocassette on a VCR does not require a standard television set capable of receiving television signals by cable or by broadcast; it is only necessary to have a monitor capable of displaying the material on the magnetized tape.

*Id.* at 853–54.

Most recently, in *Tele–Pac, Inc. v. Grainger,* 168 A.D.2d 11, 570 N.Y.S.2d 521, *appeal dismissed,* 79 N.Y.2d 822, 580 N.Y.S.2d 201, 588 N.E.2d 99 (1991), the court held (one judge dissenting) that a license to distribute certain motion pictures "for broadcasting by television or any other similar device now known or hereafter to be made known" did not encompass the videocassette film rights. "Transmission of sound and images from a point *outside the home* for reception by the *general public* ... is implicit in the concept of 'broadcasting by television.' Conversely, while one may speak of 'playing,' 'showing,' 'displaying,' or even perhaps 'exhibiting' a videotape, we are unaware of any usage of the term 'broadcasting' in that context." *Id.* 570 N.Y.S.2d at 523 (emphasis added).

#### c. *Video Rights and the RRL.*

Although the question is extremely close, under the interpretive methodology outlined above we conclude that the RRL's grant of rights to the 104 film episodes "for television viewing" *did not* encompass the right to distribute the "Curious George" films in videocassette form.

First, unlike the contracts in *Rooney* and *Lucasfilm,* the RRL contained no general grant of rights in technologies yet to be developed, and no explicit reference to "future methods" of exhibition. *Compare Lucasfilm,* 566 F.Supp. at 227; *Rooney,* 538 F.Supp. at 228. Rather, the RRL appears to contemplate a comparatively limited and particular grant of rights, encompassing only the 104 film episodes and leaving future uses of "Curious George" to later negotiation in the ancillary products agreement. Although the RRL conversely contains no "specific limiting language," *compare Cohen,* 845 F.2d at 853, we believe such limitation is reasonably inferable from the situation of the parties and the "general tenor of the section" in which the "television viewing" rights were granted.

Second, as properly noted in *Cohen,* "television viewing" and "videocassette viewing" are not coextensive terms. Even though videocassettes *may be,* and often are, viewed by means of VCRs on home television screens, *see, e.g., Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984) (noting prevalent use of videocassette recorders for "time-shifting" of commercial television programming); *Rooney,* 538 F.Supp. at 228 ("whether the exhibition apparatus is a home videocassette player or a television station's broadcast transmitter, the films are 'exhibited' as images on home television screens"), still, as the Ninth Circuit pointed out, a "standard television set capable of receiving television signals" is not strictly required for videocassette viewing. *Cohen,* 845 F.2d at 854. "[I]t is only necessary to have a monitor capable of displaying the material on the magnetized tape." *Id.* Indeed, a number of non-television monitors recently marketed in the United States permit videocassette viewing on computer screens, flat-panel displays, and the like.[8] Thus, we find insufficient reliable indicia of a contrary mutual intent on the part of Rey and LHP to warrant disturbing the district court's implicit determination that the language of the RRL is not "broad enough to cover the new use." *Bartsch,* 391 F.2d at 155.

---

**8.** *See, e.g.,* Nathalie Welch, *ASK Flat–Panel Display Now Available in U.S.,* MacWeek, January 4, 1993 (noting availability of flat-panel LCD monitor capable of displaying VCR output); Alice Laplante & Stuart Johnston, *IBM Unveils Multimedia Adapter Board, Software Toolkit,* InfoWorld, February 12, 1990 (noting availability of MCA adapter card permitting videocassette images to be viewed and manipulated on PS/2 color computer monitor).

Finally, any lingering concerns about the correctness of the district court's interpretation are dispelled by the evidence that the RRL (including its "television viewing" clause) was drafted and proposed by LHP, a professional investment firm accustomed to licensing agreements. Rey, an elderly woman, does not appear to have participated in its drafting, and, indeed, does not appear to have been represented by counsel during the larger part of the transaction. Under these circumstances, as noted *supra* p. 1388, ambiguities in the drafting instrument are traditionally construed against the licensor and the drafter. *See also Nimmer* at 10–71 ("ambiguities [in licensing agreements] will generally be resolved against the party preparing the instrument of transfer"); *U.S. Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1051 (2d Cir.1989) (interpreting ambiguous copyright assignment against sophisticated drafting party); *see generally, e.g., Merrimack Valley Nat'l Bank v. Baird,* 372 Mass. 721, 724, 363 N.E.2d 688, 690 (1977) ("as a general rule, a writing is construed against the author of the doubtful language ... if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language").

Accordingly, as the Sony videocassette sales were not encompassed by the RRL, but governed exclusively by the APA, we find no conflict between the terms of the documents, and we affirm the award of royalties to Rey under the APA.

**B.** *The "Junk Products" Counterclaim.*

We next turn to the LHP counterclaim that Rey breached the APA by "wrongfully withholding" approval of ancillary products she considered "junky."[9] The district court agreed with LHP, holding that

> [The Ancillary Products Agreement] clearly contemplated the exploitation of Curious George.... Based on the testimony of Ms. Stoebenau and Mr. Konkle,

I find that means that there may be produced with the character, junk products, junky products.... Plaintiff [had] the right ... to insist on ... an honest and good depiction *of the character.* She did not have the right to disapprove the quality *of the product....* She had [the] right to disapprove an incorrect, improper, bad depiction of Curious George.

(Emphasis added.) The court further found:

> [A]lthough Mrs. Rey unquestionably approved many products, I find that she improperly disapproved the Sears project for the reasons just outlined; that she was unreasonable with respect to the Eden project, and that she was so rude to Ms. Craighead as to abort the second and perhaps later trilogies of the software.

(Emphasis added.) After careful consideration, we must agree with Rey that the district court misapplied the APA.

The product-approval procedure under the APA required that:

> LHP will submit product or other information sufficient to describe the product to you for prior approval. When a product is submitted ... we will wait two weeks before proceeding. If we do not receive any disapproval of the product from you within two weeks we are entitled to presume that you approve of the product. If you do disapprove of any product, you will, if feasible, suggest such changes to LHP as may render the product acceptable to you, or, if you cannot make such feasible suggestions, you may refuse to approve the product. Product approval will not be unreasonably withheld.

The term "product" is not defined in the APA. It is black letter law, however, that where "the words of an agreement are plain and free from ambiguity, they must be construed in their ordinary and usual sense," *Boston Edison Corp. v. FERC,* 856 F.2d 361, 365 (1st Cir.1988), and, as we have noted in another context, the word 'product,' taken in its ordinary and usual

---

**9.** LHP does not challenge the district court ruling that its counterclaims for interference with contractual and advantageous business relationships, breach of the implied covenant of good faith and fair dealing, and unfair business practices under chapter 93A were time-barred.

sense, "simply means 'something produced.'" *See K Mart,* 892 F.2d at 1085 (quoting Webster's Third New International Dictionary 1810 (1981)). *See also id.* at 1084 ("where possible, words should be given their natural meaning, consistent with the tenor of contractual terms"); *id.* at 1085 ("[I]t is sufficient [to avoid ambiguity] if the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points toward a readily ascertainable meaning"). Considered in context, we think the "ordinary and usual" meaning of the broad term "product" plainly indicates the parties' mutual intention that each *article* bearing the likeness of "Curious George"—not merely the likeness itself—be approved by Rey.

By contrast, the narrow interpretation urged by LHP would convert the term "product" into a mere synonym for the "Curious George" mark. Nowhere does the APA intimate that the parties contemplated that the term "product" was to be given so restrictive an interpretation. Indeed, elsewhere the APA plainly precludes the narrow interpretation urged by LHP by expressly *distinguishing* between the mark and the "product" with which it is used. *See* APA p. 3 ("[LHP] will not sell or authorize the sale or distribution of any *product on or in connection with which 'Curious George' is used ...*") (emphasis added); *id.* at 3–4 (referring to separate approval procedure for *"apparel products"*).[10] As the APA is unambiguous in this regard, the trial testimony of LHP's

10. The interpretation we adopt accords with the common-sense understanding recognized in other areas of intellectual property law. Thus, for example, in the trademark context, courts frequently have recognized that "the trademark holder [has] the right to control the quality of the goods manufactured and sold under its trademark," *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104 (4th Cir.1991) (emphasis added); *El Greco Leather Products Co. v. Shoe World,* 806 F.2d 392, 395 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987) ("The actual quality of the goods is irrelevant; it is the *control of* quality that a trademark holder is entitled to maintain") (emphasis added); *see also Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633 (1st Cir.1992) (hereinafter *Produits Nestle* ) ("[r]egardless of the offending goods' actual quality, courts have issued Lanham Act injunctions solely because of the trademark owner's inability to control the quality of the goods bearing its name"). "The rationale for this requirement is that marks are treated by purchasers as an indication that the trademark owner is associated with the product." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir.1977). Indeed, under trademark law the protection of the mark may be lost if the licensor *fails* to control the quality of the licensed goods; failure to control the quality of licensed goods can constitute an abrogation of the licensor's duty to protect the informational value of the mark. *See Kentucky Fried Chicken,* 549 F.2d at 387; *see also Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 43 (2d Cir.1986). LHP argues that the licensor's duty of control is less stringent where the mark is licensed for use in a context unrelated to the licensor's original business. *See Winnebago Indus., Inc. v. Oliver & Winston, Inc.,* 207 U.S.P.Q. 335, 340 (T.T.A.B.1980). Whatever its merit as a general matter, however, this proposi-

tion is unavailing in the present context: the APA licensed the use of "Curious George" for purposes both *related* and *unrelated* to the original (literary) use of the "Curious George" mark, and in no instance does it distinguish between "related" and "unrelated" uses.

Similarly, under copyright law, while a licensor has no "moral right" to control the quality of licensed depictions, *see Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 24 (2d Cir. 1976), she may insist, contractually, on approval provisions to "assure quality control and high standards in the exploitation" of her creative work. *See Clifford Ross Co. v. Nelvana, Ltd.,* 710 F.Supp. 517, 520 (S.D.N.Y.), *aff'd. without opinion,* 883 F.2d 1022 (2d Cir.1989); *see also Zim v. Western Pub. Co.,* 573 F.2d 1318, 1324 (5th Cir.1978) (author has "profound interest, both professional and financial, in maintaining the quality of [published products], particularly those already published under [her] name"). *Clifford Ross* is particularly instructive, as it too involved a "classic literary property," the "Babar" children's book character. Upholding a contractual provision which called for the copyright holder's participation in the selection of licensing agents for the character, and enjoining the issuance of further licenses absent the holder's approval, the court concluded that there would be "irreparable harm" to the future profitability of "Babar," and to the artistic reputation of the holder, "if the exploitation of Babar continue[d] without regard to [the licensor's] high standards of quality control." *Clifford Ross,* 710 F.Supp. at 520. *Compare Geisel v. Poynter Products, Inc.,* 283 F.Supp. 261 (S.D.N.Y. 1968) (issuing injunction under Lanham Act; finding likelihood of "irreparable harm" to author's reputation where "Dr. Seuss" toys, which author found to be "tasteless, unattractive, and of an inferior quality," were marketed as authorized by author).

witnesses, Cheryl Stoebenau and Glen Konkle, need not be considered. Extrinsic evidence may not be utilized to contradict the unambiguous terms of a written agreement. *See LTX Corp.*, 926 F.2d at 1263–64; *Triple–A Baseball Club Assoc. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 221 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

■ Even though the APA's product approval clause did not preclude Rey from rejecting products based on their "junky" quality, it did obligate her to act "reasonably" in doing so. The duty to act "reasonably," like a duty to employ "best efforts," or to act in "good faith," is not reducible to "a fixed formula[, and] varies with the facts and the field of law involved." *See Triple–A Baseball Club*, 832 F.2d at 225 (discussing contractual "best efforts" clause); *see generally* Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va.L.Rev. 195, 201, 204–07 (1968) (discussing "good faith" as "phrase without general meaning," incapable of precise definition). In a somewhat different context, the Massachusetts courts have interpreted contractual clauses preventing the "unreasonable withholding of approval" of commercial sublessees, as imposing a duty to act "in accordance with usual standards of reasonableness." *See Nassif v. Boston & M.R. Co.*, 340 Mass. 557, 564, 165 N.E.2d 397, 401–02 (1966); *Worcester–Tatnuck Square CVS, Inc. v. Kaplan*, 33 Mass.App.Ct. 499, 601 N.E.2d 485 (1992). It falls to us to define "usual standards of reasonableness," in the present context, in a way which accords with the contracting parties' intent, yet avoids rendering the "reasonableness" standard either purely illusory or duplicative of more particular contractual terms.

We think the APA's proscription of "unreasonable" product disapproval required, at a minimum, that Rey articulate some *material* reason, subjective or otherwise, for disapproving a product. That is to say, Rey could not withhold product approval without ascribing a reason, nor for reasons immaterial to the "Curious George" mark, its proposed use or commercial potential, or unrelated to Rey's artistic and reputational identification with the mark and ancillary products. Moreover, assuming there existed some material ground for withholding product approval, it would need to be communicated, consistent with contractual specifications, "within a reasonable time and in a reasonable manner, *i.e.*, in a manner which makes it possible for [the licensee] to rework the [product] in order to meet ... approval." *See Zim*, 573 F.2d at 1324. Finally, the reason for withholding product approval could not be so preclusive as to frustrate the *fundamental contractual assumptions* on which the APA was formed. In the context of this case, for example, Rey could not impose approval standards which would effectively eliminate all potential for profitable use of the "Curious George" property; the parties' mutual assent, in the APA, that Rey would be entitled to minimum royalty payments, plainly implied a mutual understanding that *some* licensing of the "Curious George" character would be acceptable, in order to enable sales from which royalties might be generated. *Cf.* Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 403 (1980) ("discretion in performance may be exercised legitimately [only] for the purposes reasonably contemplated by the parties").

■ The district court supportably found that Rey approved "many products," including the original film series, the Houghton Mifflin books, the Sony videocassettes, the first series of DLM software, and the Eden plush toys (as modified). In addition, Rey testified, without contradiction, that she had approved "children's sweatshirts, film strips; earmuffs and school bags for children ... buttons, children's books ... paper doll books[,] [w]rist watch, alarm clocks, wall clocks, footwear, little tennis shoes for children, ... [b]each slippers, ..." After reviewing the record, we are convinced that Rey did not utilize objectively unreasonable criteria for approving products under the APA. We turn to the particular product rejections challenged on appeal.

**1394**

### 1. *The Sears Pajamas.*

■ The district court ruled that Rey acted unreasonably by basing her disapproval of the Sears project on the "junky" quality of the pajama material which would bear "Curious George's" likeness.[11] As we have stated, *see supra* at p. 1393, the basis for the district court's finding of "unreasonableness" was insufficient as a matter of law. Rey did not unreasonably withhold approval of the Sears pajama project as unbefitting the "Curious George" image protected by her copyright, because the grounds for withholding approval were reasonably related to the integrity ·and commercial value of her artistic creation. *See Clifford Ross*, 710 F.Supp. at 520.[12]

### 2. *The Beach Paper Products.*

■ Our conclusion that Rey reasonably rejected the Sears project disposes of LHP's claim for damages relating to the Beach paper products as well. Rey never saw, much less "disapproved," the Beach paper products: as the undisputed evidence shows, Beach withdrew its proposal when the Sears project fell through; it never reached agreement with LHP or presented any product to Rey for approval. Therefore, LHP's claimed right to recover potential profits from the Beach project could be justified, if at all, only as *consequential damages* resulting from a wrongful rejection of the Sears project. As the Sears project was not wrongfully rejected under the terms of the APA, LHP is not entitled to consequential damages related to Beach's anticipated profits. *See, e.g.,*

*Ryan v. Royal Ins. Co.*, 916 F.2d 731, 744 (1st Cir.1990) ("unless appellants can demonstrate that [appellee] breached a duty owed to them.... consequential damages will not lie").

### 3. *The Eden Plush Toys.*

The district court ruled that Rey acted unreasonably with respect to the Eden plush toys project, but the court did not state whether its ruling was based on Rey's objections to the "junky" nature of the proposed product, or some other ground. We conclude, nonetheless, that remand is unnecessary in the present circumstances, *see Produits Nestle*, 982 F.2d at 640–41 ("when a trial court misperceives and misapplies the law, remand may or may not be essential"), since LHP did not present sufficient evidence to enable a finding that Rey's actions with respect to Eden were "unreasonable." *See id.* at 642 (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 463 (1st Cir.1992)).

■ Applying the standard articulated *supra* p. 1393, "reasonableness" in the present context turns, first, on whether the reasons for rejecting a proposed product were "material." As recently noted by the court, "[t]here is no mechanical way to determine the point at which a difference becomes 'material.' Separating wheat from chaff must be done on a case-by-case basis." *Produits Nestle*, 982 F.2d at 641. In reference to conventional commercial products, such as the Perugina chocolates licensed in *Produits Nestle*, the appropri-

---

11. The district court did not address the aesthetic reasons Rey gave for rejecting the Sears project, *viz.*, the "bright yellow" color of the pajama material and the unrecognizable "plump" depiction of "Curious George." We believe these grounds were not unreasonable.

12. LHP nonetheless maintains that Rey's rejection of the Sears pajama project was "unreasonable," insofar as it was not communicated in a manner which "ma[de] it possible ... to rework the [product] in order to obtain ... approval." *Zim*, 573 F.2d at 1324. LHP argues that time pressures inherent in the Sears catalog deadlines made the presentation of the pajamas a "one-shot deal," with "reworking" of the design impossible once rejection had occurred. It in-

sists that the "lousy material" in the pajamas—a basis for Rey's disapproval—was required by federal fire safety standards; no other material was available for use in the product.

Even assuming these fact-based arguments are well founded, however—an assessment we are in no position to make on the present record—they are beside the point: the APA's "reasonableness" constraint did not oblige Rey to apply lower standards, or to relax her vigilance in policing ancillary uses for the "Curious George" character, merely because deadlines were tight or objections to the product *could not* be cured. *See* APA at p. 3 ("if you disapprove of any product, you will, *if feasible*, suggest such changes to [LHP] as may render the product acceptable to you") (emphasis added).

ate test is whether the ground for refusing to approve a version of a licensed product is one which "consumers would likely consider relevant." *Id.* In the context of an artistic creation such as "Curious George," however, the highly subjective element of "creativity," connecting product and author, implicates intangible considerations such as the "total concept and feel" of the product. *See Roth Greeting Cards v. United Card Co.,* 429 F.2d 1106 (9th Cir. 1970); *see also Sid & Marty Krofft Television Productions, Inc. v. McDonalds Corp.,* 562 F.2d 1157 (9th Cir.1977). We believe an author's discretionary right to disapprove an ancillary product, as not in keeping with the aesthetic image the author envisions for her artistic creation, reasonably may be made to depend on product conformity, at least where, as here, conformity with the author's aesthetic standard would neither set unreasonably high levels of commercial practicality nor foreclose all *prospect* of profitability on which the contract was predicated. *See supra* at p. 1393.

■ The evidence before the district court clearly showed that Rey imposed a demanding aesthetic standard for the design of the Eden Toys doll.[13] Eden's frustration at Rey's meticulous immersion in the details of toy design may indeed be understandable, the more so perhaps because of the irascible terms in which Rey appears to have chosen to couch her product criticisms on occasion. Even viewing the evidence as a whole in the light most flattering to LHP, however, we cannot conclude that her proposed changes were unrelated to her legitimate artistic concerns or to her desire to protect the aesthetic integrity of the "Curious George" image.

"Reasonableness" likewise requires, of course, that changes be made "within a reasonable time and in a reasonable manner, *i.e.,* in a manner which makes it possible for [the licensee] to rework the [product] in order to meet ... approval." *See Zim,* 573 F.2d at 1324. The evidence before the district court, which we have examined in detail, did not show that Rey's product criticisms, though caustic, were made in an unreasonable time or manner. And although the record is replete with testimony that Eden and LHP grumbled about Rey's product criticisms, neither Eden nor LHP ever communicated *to Rey,* prior to the present lawsuit, that her proposed changes to the Eden plush toy products were impracticable or even unduly burdensome.[14] Since Rey's objections to Eden's original toy design were based on criteria reasonably related to her legitimate artistic and aesthetic concerns about the proposed ancillary product, and were communicated in a time and manner which would permit Eden to conform the product, we conclude that Rey's rejection of Eden's product designs was not "unreasonable."

### 4. *The DLM Software.*

■ Finally, we consider whether Rey's alleged rudeness to Donna Craighead, the DLM project manager, amounted to an "unreasonable withholding of approval" of the DLM software project in violation of the APA. We conclude that it did not. As all parties agree, the licensing arrangement between DLM and LHP covered only the first installment in the proposed DLM software trilogy, the first installment was *approved* by Rey prior to her telephone conversation with Craighead, and DLM continued to manufacture and market the first-installment software even after Rey's intemperate remarks. Given the fact that Rey's statements led to no curtailment in the production or sale of the licensed software, we are unable to discern any relevant respect in which Rey's statements to Craighead could be considered a "rejection" of the product for which LHP had issued its license to DLM.

---

**13.** For example, she relocated the felt patterns on "Curious George's" face by a few millimeters and rejected particular colors and color combinations which Eden thought would make the doll more saleable.

**14.** For example, the President of Eden Toys testified: "[W]hat we tried to do, therefore, was to get very specific, and say: If you want it moved three millimeters to the left, *we'll move it,* but let's all agree on that's where it's going to be...." (Emphasis added.)

The district court apparently thought that Rey's harsh criticism of the first software installment may have discouraged DLM from undertaking "second and ... later" installments in the proposed trilogy. Here, however, the relevant consideration is that these subsequent installments *had not yet been licensed* by the time Rey communicated her criticism about the *first* software product and manual. Even were Rey's criticism actionable in tort, as an "intentional interference with contractual relations," *see* Restatement (Second) of Torts § 766, or as a breach of the implied good-faith duty not to interfere with LHP's performance under the APA, it nevertheless was not actionable in contract. Under the plain terms of the APA, Rey could not "reject" products not yet licensed or presented for approval.[15]

LHP attempts to extend the APA's plain language by characterizing Rey's criticism of the DLM project as "essentially *revok[ing]* product approval [of] the DLM software *concept*" already approved by Rey. LHP does not define the term "software concept," but clearly uses it to encompass not only the first DLM product but all subsequent installments in the planned trilogy. Such an interpretation would not withstand analysis under the language of the APA, however, nor comport with the undisputed record evidence.

We reject LHP's overly expansive definition of "product" in the present context. By lumping all DLM software products under the umbrella of a single software "concept," LHP would eviscerate Rey's retained right to grant, or reasonably withhold, approval for distinct generations of software products in a particular software series.

All *conceptually* related articles identified by LHP as part of the same series would be deemed approved, sight unseen; the policing of the integrity of the conceptual relationship presumably having ceased to be a matter of legitimate concern to Rey. Courts universally recognize that the elasticity of contract language is limited by the natural meaning of its terms and their context. *See K Mart*, 892 F.2d at 1085; *Boston Edison Corp.*, 856 F.2d at 365. LHP's interpretation strips the "product approval" term from its context and depletes its natural meaning.

### CONCLUSION

Under the APA, Rey is entitled to recover the royalties wrongly withheld on the Houghton Mifflin books and Sony videos; and we affirm the district court rulings respecting these claims. The APA likewise entitled Rey to withhold approval of licensed ancillary products on reasonable grounds; thus, LHP was not entitled to recover damages for Rey's reasonable exercise of her right to withhold approval of the Sears pajama project, the Beach paper products, the Eden Toys project, or the DLM software.[16] Accordingly, the damages awards to LHP are vacated.

*Affirmed in part, reversed in part; costs are awarded to Rey.*

**15.** The district court ruled that the tort claims arising out of "most of" Rey's conduct were time-barred. LHP does not challenge this ruling. *See supra* n. 9 and accompanying text.

**16.** We have considered all other arguments advanced by the parties and find them either to be wanting or, alternatively, moot. Without limiting the generality of the foregoing, we note that, because we conclude that Rey reasonably withheld approval of the Sears project, the Eden plush toys, and the DLM software, we need not consider whether LHP's estimates of lost future profits from these products were sufficiently certain and nonspeculative to support an award

of damages. *See, e.g., Hendricks & Assocs., Inc. v. Daewoo Corp.,* 923 F.2d 209, 217 (1st Cir. 1991) (citing *John Hetherington & Sons,* 210 Mass. 8, 21, 95 N.E. 961 (1911)); *Redgrave v. Boston Symphony Orchestra, Inc.,* 855 F.2d 888, 893 (1st Cir.), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1988). Nor need we consider whether the damages awarded LHP for these products should have been reduced by *50%,* reflecting Rey's share of product royalties under the pre–1988 APA formula, or by 33%, under the revised APA formula for products licensed after January 1, 1988.