FRED. S. JAMES & CO. OF NEW ENGLAND, INC. *vs.*
MARGARET I. HOFFMANN & others.[1]

Suffolk.    May 15, 1986. — May 7, 1987.

Present: ARMSTRONG, KAPLAN, & BROWN, JJ.

*Contract,* Agreement not to compete, Construction of contract. *Evidence,*
   Extrinsic affecting writing.

The effect of a certain ostensibly two-party management agreement, whereby
   an insurance brokerage company would control the management and
   servicing of another insurance agency's accounts for a period of years,
   own those accounts at the end of the period, and pay the former owner
   of the accounts a fixed sum of money each month during that period,
   when read together with a separate letter agreement, under which the
   former owner's son agreed not to compete with the new owner after his
   employment with the new owner had ended, was entirely a matter of
   law and, in the absence of any genuine factual issue apparent from the
   materials before a judge who heard the former owner's motion for sum-
   mary judgment on her claim under the management agreement, partial
   summary judgment was properly entered determining that, whatever the
   new owner's rights might be against the former owner's son on his
   alleged breach of the covenant not to compete, the new owner was obli-
   gated to make payments under the management agreement. [163-165]

CIVIL ACTION commenced in the Superior Court Department
on November 19, 1979.

The case was heard by *George N. Hurd, Jr.,* J., on a motion
for summary judgment.

*Robert D. City* for the plaintiff.
*Eugene G. Panarese* for Margaret I. Hoffmann.

---

[1] Louis P. Hoffmann and Louis P. Hoffmann Insurance Agency. The
agency, so far as the record discloses, is not incorporated and is only the
name under which the defendant Louis P. Hoffmann conducts his insurance
agency or brokerage business. Assuming this to be true, the agency should
not be named as a party.

*Alan G. Miller, Mitchell S. King & Mark P. Bailey,* for Louis P. Hoffmann, submitted a brief.

ARMSTRONG, J. In the 1930's one Louis H. Hoffmann developed an insurance brokerage business that specialized in providing insurance to customers in the liquor, wine, and beverage businesses. In the 1940's he entered into a commission-sharing arrangement with another insurance brokerage firm, John C. Paige and Company (Paige), whereby Paige would handle the underwriting and accounting services for the Hoffmann accounts, leaving Louis H. Hoffmann more time for customer relations. Louis H. Hoffmann died in 1948, and Paige entered into a similar arrangement with his widow, the defendant Margaret I. Hoffmann, who continued to service the Hoffmann accounts.[2]

The defendant Louis P. Hoffmann is the son of Louis H. and Margaret. In the early 1960's he started work for Paige, and in 1965 he and Margaret entered into an agreement with Paige providing that the Hoffmann book of business would become the property of Paige upon Margaret's death and that Paige would pay to Louis P. Hoffmann the commissions that would have been due to Margaret on the Hoffmann book of business for a period of six years thereafter (or for the time, if longer, that Louis P. Hoffmann should remain in Paige's employ).

Paige was acquired by the plaintiff, Fred. S. James & Co. of New England, Inc. (James), in 1972, and Louis P. Hoffmann (hereafter, Louis) became James's employee. Like other employees, he was required to, and did, sign an agreement in 1973 not to use for his own benefit confidential information acquired in the course of the employment and, for a period of three years after the termination of his employment, not to solicit or accept business from James's customers. The 1965 agreement between Margaret, Paige, and Louis remained in effect, with James assuming Paige's rights and obligations.

By this time Margaret was essentially out of the business; Louis was servicing the Hoffmann accounts. The arrangement

---

[2] The Hoffmann accounts, or "book of business", were treated as the property of Margaret and were serviced under the name of "Louis H. Hoffmann Insurance Agency."

was unsatisfactory to James, which was, it felt, paying both Margaret (through her share of the commissions) and Louis (through his compensation as an employee) for doing the same work. In 1977 the parties negotiated a new contractual arrangement, which negotiations (according to James's representations) were conducted by Louis for Margaret as well as for himself. Two documents resulted: James and Margaret executed an ostensibly two-party agreement (management agreement), whereby James would control[3] the management and servicing of the Hoffmann accounts for six years and at the end of that period would own the accounts; that it would pay Margaret $2,866.08 per month over that period, regardless of the actual commissions generated by the Hoffmann accounts; that Margaret would turn over to James all books and records relating to the accounts; and that Margaret would not solicit or accept business from any of the customers constituting the Hoffmann accounts for the period of the agreement and three years thereafter. The management agreement was undated and was said to take effect as of June 1, 1977. The second document (letter agreement) took the form of a letter from Louis to James, countersigned as "accepted" by James. It recited that it was being executed in connection with the management agreement; that, in consideration of James's executing the management agreement, Louis agreed (1) to the termination of his rights under the earlier contracts with Paige[4]; (2) that the Hoffmann account customers would be treated as James's customers for purposes of the noncompetition covenant Louis had agreed to in 1973; and (3) that the period of noncompetition would be extended (from three years after Louis's employment with James ended, to three years after the later of that or the final payment to Margaret under the management agreement). The letter agreement was dated January 10, 1978.

---

[3] The agreement stated that "James will have the sole discretion (reasonably exercised) to make all decisions concerning such business [the Hoffmann accounts], including the discontinuance of all or any portion of it."

[4] Specifically, the 1965 contract between Margaret, Paige, and Louis had given Louis a right to receive commissions on the Hoffmann accounts after Margaret's death (or her earlier assignment of the accounts to Paige) for a period of at least six years.

In 1979 Louis left the employ of James and established his own insurance firm, the Louis P. Hoffmann Insurance Agency. James filed this action, originally only against Louis, alleging that, beginning in May, 1979, Louis had been violating the terms of the covenant not to compete by soliciting and accepting business from Hoffmann account customers. James ceased making its monthly payments to Margaret after September, 1979, and amended the complaint, naming Margaret as a party, and asking for a declaration that it was no longer obligated to make the payments. Margaret counterclaimed, seeking the payments called for by the management agreement, with interest, as well as damages under G. L. c. 93A. Margaret then filed a motion for summary judgment, advancing the position that, whatever James's rights might be against Louis on the alleged breach of the covenant not to compete, James was obligated as matter of law to make its payments to her. Her motion was allowed, and final judgments under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), were entered in her favor on the counts of James's claim and her counterclaim relating to James's contractual liability under the management agreement. This case is before us on James's appeal from those partial judgments.

The defendants, supporting the judge's action, argue that the management contract is unambiguous in its terms and that extrinsic evidence, such as the terms of the letter agreement between James and Louis, is inadmissible to explain or control its terms.[5] Massachusetts, however, has adopted the position of Restatement (Second) of Contracts § 214 (1981) that evidence of the contract negotiations and the circumstances of its execution are always admissible to show whether the contract was intended by the parties as an integrated (i.e. final) expression of the terms of their agreement or to show the existence of any uncertainties in the contract's application. See *Robert*

---

[5] The defendants rely on a line of cases represented by *Voilette* v. *Rice,* 173 Mass. 82, 84 (1899); *Glackin* v. *Bennett,* 226 Mass. 316, 319-321 (1917); *Nelson* v. *Hamlin,* 258 Mass. 331, 340 (1927); *Berman* v. *Geller,* 325 Mass. 377, 379-380 (1950); *Gifford* v. *Gifford,* 354 Mass. 247, 249 (1968); *Finnerty* v. *Reed,* 2 Mass. App. Ct. 846, 847 (1974); *Bendetson* v. *Coolidge,* 7 Mass. App. Ct. 798, 802-803 (1979).

*Indus., Inc.* v. *Spence,* 362 Mass. 751, 753-754 (1973); *Antonellis* v. *Northgate Const. Corp.,* 362 Mass. 847, 850-851 (1973); *Wang Laboratories, Inc.* v. *Docktor Pet Centers, Inc.,* 12 Mass. App. Ct. 213, 219-221 (1981); *Alexander* v. *Snell,* 12 Mass. App. Ct. 323, 324-325 (1981). The cases relied on by the defendants (see note 5, *supra*) are distinguishable for the reason stated in *Roberts Indus., Inc.* v. *Spence,* 362 Mass. at 754 ("Expressions in our cases to the effect that evidence of circumstances can be admitted only after an ambiguity has been found on the face of the written instrument have reference to evidence offered to contradict the written terms)."

We do not, however, understand that to have been the basis on which the judge ruled in Margaret's favor. He received and considered depositions and affidavits bearing on the negotiations, and he referred to the letter agreement but ruled that it did not affect Margaret's right to the monthly payments called for by her agreement.

That ruling was correct. There is nothing in the terms of the letter agreement, and nothing was shown in the negotiations of the parties, that suggests that Margaret's right to receive the monthly payments was contingent on Louis's faithful performance of his obligations under the letter agreement. Compare *Roberts Indus., Inc.* v. *Spence,* 362 Mass. at 754-756; *Thomas* v. *Christensen,* 12 Mass. App. Ct. 169, 174-177 (1981). Contrast *Chelsea Indus., Inc.* v. *Florence,* 358 Mass. 50, 55-56 (1970), where simultaneously executed contracts contained provisions that dealt in different (and conflicting) ways with the same subject matter.

We may accept James's contentions that the two agreements were executed together, that the management agreement would not have been executed had Louis not signed the letter agreement, that the two agreements are to be read together as the "completely integrated" (see Restatement [Second] of Contracts § 210) understanding of the parties, and that Louis's breach tends to undermine what, from James's point of view, was the core purpose of the arrangement: namely, to obtain ownership of the Hoffmann accounts. None of these alters the fact that James, as one part of a three-cornered bargain, agreed

to enter into a separate agreement with Margaret, conditioned only on her own performance, and independent of Louis's future dealings with James. James sought to protect the accounts by enlarging Louis's covenant not to compete to cover them, and its recourse, if any, must be found in its contract with Louis.[6]

The effect of the separate contracts, read together, was a matter of law for the court to decide, unless facts were disputed which bore on their interpretation. *Blake Bros. Corp.* v. *Roche,* 12 Mass. App. Ct. 556, 558 (1981), citing *Robert Indus., Inc.* v. *Spence,* 362 Mass. at 755. Nothing in the pleadings, affidavits, or depositions presented with the motion for summary judgment suggested the existence of any question of fact that was material to James's obligations to make payments under the management agreement. This case was thus appropriate for summary judgment.

*Judgments affirmed.*

---

[6] This conclusion is not affected by the facts that (a) Louis handled the negotiations for Margaret; (b) Louis, during negotiations, insisted that Margaret's contract be separate from his own and not make reference to Louis; and (c) Margaret has designated Louis to receive her monthly payments. As to the latter, the management agreement specified that the monthly payments would be made to Margaret or her designee. It also provided that Margaret could assign her rights under the agreement and that any assignee would be bound by the terms of the management agreement. Louis receives the payments under designation, presumably revocable, not under an assignment of the contract, Moreover, we see nothing in James's argument that Margaret warranted her title to the Hoffmann accounts, that such title was not to pass until the end of the six-year period, and that the loss of the accounts to Louis constituted, in effect, a breach of warranty entitling James to terminate its payments. The management agreement was clear to the effect that James was to have sole and complete authority to manage and control the accounts during the six-year period (see note 3, *supra*), and its action in its own name against Louis is an exercise of that authority. Note that Margaret's payments were not dependent on the commissions generated from the Hoffmann accounts and that the agreement even contemplated that James might cease writing insurance for Hoffmann account customers.