## Caroline D. Cabot vs. Robert C. Cabot.

No. 99-P-698.

Norfolk. October 10, 2001. - September 9, 2002.

Present: Porada, Gillerman, & Duffly, JJ.

*Divorce and Separation,* Modification of judgment. *Contempt. Contract,* Construction of contract, Rescission.

In an action for modification of a divorce judgment, the judge correctly concluded that an earlier agreement between the parties was not an integrated agreement and did not address the issue of the college costs of their children; therefore, the judge properly could consider whether there had been a material change in the parties' circumstances since the divorce justifying modification of the divorce judgment to require contribution from the former husband to the children's college costs [760-765]; where the evidence demonstrated such a material change, the judge properly ordered the husband to repay his former wife for her previous contributions to the college expenses of their children, and properly gave the former wife the option of setting off the amounts due from the husband against amounts owed to him [765-768].

On a complaint for contempt alleging that a former husband had failed to comply with the terms of a modified divorce judgment concerning the funding and management of a trust for his children, the record provided ample support not only for the judge's findings and conclusion that the former husband persistently disregarded clear and unambiguous orders contained in that judgment and was in contempt, but also for the judge's award of damages. [769-773]

A Probate Court judge properly denied a former wife's request for rescission of an agreement modifying a divorce judgment, based on the former husband's breach of the agreement, where the evidence did not establish an utter failure of consideration or a repudiation of the agreement by the husband. [773-774]

Complaint for divorce filed in the Norfolk Division of the Probate and Family Court Department on February 10, 1981.

A complaint for contempt, filed on March 8, 1990, and a complaint for modification, filed on October 29, 1990, were heard by *Eileen M. Shaevel,* J.

*Joseph H. Walsh* for Robert C. Cabot.

*Fern L. Frolin* for Caroline D. Cabot.

DUFFLY, J. By the end of the seven years it took to conclude litigation on a modification complaint that sought parental contribution to college costs, an issue not addressed by the divorce judgment, the parties' two children both had graduated from college. The defendant, Robert C. Cabot (Robert), appeals from a modification judgment ordering that he repay his former wife, Caroline D. Cabot (Caroline), for her prior contributions to the children's college expenses.

The modification action was consolidated for trial with a contempt action filed by Caroline.[1] Robert appeals the contempt judgment against him[2]; Caroline cross-appeals from so much of the contempt judgment that fails to nullify or rescind the 1985 agreement that is the basis of the judgment holding Robert in contempt. The appeals from both judgments have been consolidated for review. We affirm the judgments.

*Background.* We affirmed the parties' 1982 divorce judgment nisi in *Cabot* v. *Cabot*, 18 Mass. App. Ct. 903 (1984). That judgment provided, in pertinent part, that Caroline have physical custody of the parties' two minor children, a daughter, born June 20, 1973, and a son, born February 9, 1975. Robert was to make payments of unallocated support for the children and Caroline.[3] Although the trial judge recognized that both children, as had their father before them, attended the Charles River

---

[1] Robert claims that a postdivorce, surviving modification agreement made in 1985 precludes this further modification of the divorce judgment, absent "countervailing equities" that were not present in this case. He also claims that the order was in essence one for retroactive child support and was precluded because both children had reached the age of twenty-three by the time judgment entered, and that the relief ordered by the trial judge in both actions (permitting Caroline to offset amounts due her from Robert against his share in the marital residence, and to buy out Robert's remaining interest) was tantamount to an impermissible modification of the division of marital assets.

[2] Robert claims that he had not wilfully disobeyed a clear and unambiguous order, and that, in any event, Caroline's unclean hands preclude a finding of contempt.

[3] Support in the amount of $2,500 per month was subject to cost of living increases and a decrease upon emancipation of one child; it was to cease altogether upon emancipation of both. Caroline was given the right to occupy the marital residence (title to which apparently continues to stand solely in Robert's name) until her remarriage or upon emancipation of the children, when it would be sold and the net proceeds of sale divided equally. The par-

School, he made no order obligating Robert to contribute to the cost of private schooling, leaving these expenses to be paid by Caroline. Neither did the divorce judgment address the issue of the children's college expenses; this was, as we shall discuss, to be expected as they were then in grammar school.

Two years later, Caroline sought initial modification of the divorce judgment. In connection with that action, the parties entered into a stipulation for judgment in March, 1985, that also constituted the parties' surviving agreement.[4] The terms of the agreement were incorporated in a modification judgment.[5] It is this agreement that Robert claims bars further modification of the divorce judgment and that Caroline claims should have been rescinded.

The agreement, which we describe in greater detail later in this opinion, required the parties to fund a "Clifford" trust established for the children during the marriage[6] with proceeds from the sale of certain real property. Robert agreed that, as

ties' Vermont real estate was to be sold "forthwith," with the net proceeds of that sale to be divided equally between them.

[4]Although denominated by the parties as a stipulation for judgment, the parties do not dispute that the document constitutes an agreement that was to survive the modification judgment as an independent contract.

[5]The parties' 1985 agreement contains a clause stating "the intent of the parties [is] that [the agreement] shall be incorporated into a Judgment of Modification by the Court but shall nevertheless survive as an independent agreement."

A modification agreement may, by its terms, survive the judgment as an independent and binding contract. To the extent that such an agreement seeks to serve as a bar to future attempts to modify it, it is subject to the same requirements and exceptions as a separation agreement that is incorporated in the original divorce judgment. See *Bracci* v. *Chiccarelli*, 53 Mass. App. Ct. 318, 322-323 (2001). The parties make no claim that the 1985 agreement was not judicially determined to be fair and reasonable.

[6]Robert was at all times the sole trustee of the Robert C. Cabot Children's Trust (the children's trust). The trial judge found that this trust, a so-called "Clifford" trust, had been established by Robert in 1978, prior to the parties' divorce, and that "[u]nder the law as it existed at that time, the purpose of a Clifford Trust was to shift income from parent to child without tax consequences." Under terms of the trust, income generated by trust assets was to be distributed at least annually to the beneficiaries, the parties' children. The judge found that Robert had contributed $26,000 to the trust and that, under then applicable law, the principal would revert to Robert as settlor upon termination of the trust. The divorce judgment made no disposition respecting this trust.

trustee, he would maintain the principal of this trust in "high income producing securities consistent with the manner in which the funds have been maintained in the past and shall exercise his discretion to this end consistent with the duties he owes as trustee." Trust income was to be paid at least annually and used to pay the first $14,000 per year of the children's education costs. To the extent that the children's "education costs" (a term to which we shall return) exceeded the total of $14,000, the parties agreed they would each pay one-half of the excess.

In March, 1990, Caroline filed a contempt complaint alleging (as later amended and as is relevant to the issues on appeal) that Robert had violated the 1985 modification judgment by failing to pay his share of the children's private school education expenses; to maintain the assets of the children's trust in high-yield investments; and to distribute the income from the children's trust in accordance with the modification judgment. She also filed, in October, 1990, a complaint in which she sought an order that Robert be required to pay the upcoming college tuition and related expenses of their children. The actions were consolidated for trial which commenced in December, 1997, and continued over seven nonconsecutive days, concluding January 18, 1998. Judgments issued in August, 1998, and these appeals followed.

The more than seven-year hiatus between the dates on which the original complaints were filed and the date the trial began was the result of numerous intermediate proceedings and litigation that failed to resolve the disputes which were the subjects of actions appealed from.[7]

We conclude that the trial judge was warranted in modifying the divorce judgment and in finding Robert in contempt, and also that there was no abuse of discretion inherent in the remedies ordered by the judge.

---

[7]The tortuous litigation history is, for the most part, not relevant to these proceedings. It will suffice to note that, in 1992, Caroline filed complaints for contempt and modification in which she made claims substantially identical to those that had been made in the 1990 complaints. The judge presiding at trial on the complaints which are the subject of this appeal treated Caroline's 1992 contempt and modification complaints as amendments to the 1990 complaints, and granted relief for the period dating from the 1990 filing dates. No issue was raised as to this conclusion.

1. *The modification judgment.* As we have noted, by the time of entry of the 1998 judgment that is the subject of this appeal, the parties' son was twenty-three, their daughter twenty-five, and both had graduated from college. While awaiting an order assigning responsibility for these expenses, Caroline was largely responsible for assuring that college was paid for. Pursuant to a temporary order issued in June, 1992, Robert was ordered to pay his daughter's first semester college expenses. The judgment that was entered in 1998 modified the 1982 divorce judgment by ordering Robert to reimburse Caroline for amounts she had contributed to the children's college educations and requiring that he pay the outstanding loans obtained or guaranteed by Caroline in connection with these college costs.

(a) *Status of the 1985 agreement.* According to Robert, the following provision in the 1985 agreement precludes modification of the divorce judgment:

> "In consideration of the foregoing agreement of modification the parties hereto after being fully informed of their rights under *Stansel* v. *Stansel*[8] agree on the finality of the terms of this agreement as to alimony, child support, education and medical expenses."

He argues that the reference in this provision to "education" is clear and encompasses "college education" and that the trial judge erred in admitting extrinsic evidence to explain and vary the term.

Robert goes on to argue that, even if we were to conclude that "education" refers solely to pre-college education and that the agreement is silent on the issue of college costs, as a fully integrated, surviving agreement it can be modified only upon

---

[8]*Stansel* v. *Stansel*, 385 Mass. 510, 514 (1982), quoting from *Reeves* v. *Reeves*, 318 Mass. 381, 384 (1945), held that separation agreements that survive divorce judgments are valid "when free from fraud and coercion and when fair and reasonable," and will preclude modification of provisions limiting alimony payments on the mere showing of changed circumstances.

The issue has not been raised that to the extent the agreement for unallocated monthly support payments includes child support, it may not have been susceptible to such binding limitations. See *Quinn* v. *Quinn*, 49 Mass. App. Ct. 144, 146 (2000); G. L. c. 208, § 28; G. L. c. 209, § 37.

"countervailing equities," a showing not made here, and not merely upon materially changed circumstances. See *McCarthy* v. *McCarthy*, 36 Mass. App. Ct. 490, 493 (1994) ("more than a material change in circumstances or, to use the analogous term, a 'countervailing equity,' " is required to modify surviving agreement). This is because (he argues) the integrated agreement governs all of the parties' obligations to one another, including the children's future college expenses; the failure to make provision in the agreement for the payment of these college expenses reflects the parties' intention that neither party was obligated to pay them. See *ibid.*

The trial judge found that the agreement "was intended to provide a mechanism for payment of and apportionment between the parties of the children's private school expenses *through high school only*," and further that "[t]he issue of college expenses was . . . rather postponed for a later determination in that it was premature ([the children] were only 11 and 9 respectively), and Robert was in any event unwilling to address the issue of college at that time" (emphasis original). These findings, which are to the effect that the agreement did not address college costs and was not an integrated agreement, are supported by the evidence.

In making her findings, the judge appropriately relied on extrinsic evidence. "Where contract language employed by the parties leaves their obligations (and, as in this case, the status of the agreement itself) in doubt, the court will place itself in the position occupied by the parties and 'will examine the subject matter of the agreement and the language employed, and will attempt to ascertain the objective sought to be accomplished by the parties.' " *Parrish* v. *Parrish*, 30 Mass. App. Ct. 78, 86 (1991), quoting from *Feakes* v. *Bozyczko*, 373 Mass. 633, 635 (1977).

The attorney who had represented Caroline in connection with the negotiation and drafting of the 1985 agreement and related modification proceeding testified that Robert (through his attorney) had declined to discuss college costs. Caroline likewise testified that while she had hoped to resolve the issue so as not to have to incur legal costs in the future, Robert refused to discuss it. Both Caroline and her attorney testified

that the issue of future college costs was determined to be too speculative by the Probate Court judge (who was not the same judge who heard the complaints that are the subject of this appeal) conferencing the matter; the children were only nine and eleven years old at the time, and whether they would in fact go to college was not yet known. The issue was therefore left to be resolved at a future date. This was consistent with the "general rule, [that] support orders regarding the future payment of post-high school educational costs are premature and should not be made." *Passemato* v. *Passemato*, 427 Mass. 52, 54 (1998). *L.W.K.* v. *E.R.C.*, 432 Mass. 438, 452-453 (2000).[9]

The reference to "education," in the context of the 1985 agreement as a whole, also supports the judge's view that the term refers solely to private grammar and high school costs. The subject of the 1985 agreement was specific to support, uninsured medical expenses of the children, and private school expenses. The agreement states that "[i]n consideration of the *foregoing agreement*[,] . . . the parties . . . agree *on the finality of the terms of this agreement* as to . . . education" (emphasis supplied). The agreement provides that trust income was payable to both children until 1991, when one-half would be paid to the son only until 1993, dates coinciding with anticipated completion of the children's preparatory school education. "[T]he scope of a party's obligations cannot 'be delineated by isolating words and interpreting them as though they stood alone.' " *Starr* v. *Fordham*, 420 Mass. 178, 190 (1995), quoting from *Boston Elevated Ry.* v. *Metropolitan Transit Authy.*, 323 Mass. 562, 569 (1949).

In light of the foregoing, the trial judge reasonably construed

---

[9] A probate judge has the authority, upon a judgment for divorce or subsequent modification, to "make such judgment as it considers expedient relative to the care, custody and maintenance of the minor children of the parties." G. L. c. 208, § 28, as amended by St. 1975, c. 400, § 29. The court is authorized to make orders beyond support to include education for "any child who has attained age eighteen but who has not attained age twenty-one and who is domiciled in the home of a parent, and is principally dependent upon said parent for maintenance." G. L. c. 208, § 28, as amended by St. 1976, c. 279, § 1. Under certain additional conditions, this authority extends to a child "who has not attained age twenty-three." G. L. c. 208, § 28, as amended by St. 1991, c. 173, § 1. See *L.W.K.* v. *E.R.C.*, 432 Mass. at 452-453 (no authority to establish educational trust fund for ten year old).

the term "education" to mean "schooling up to but not including post high school education." There was no error.

Turning now to Robert's argument that the agreement is integrated, we note that it was for the trial judge to determine whether the 1985 agreement "was the entire agreement of the parties," *Alexander* v. *Snell*, 12 Mass. App. Ct. 323, 324 (1981), or whether certain other of the parties' obligations to each other and to their children were the subject of other agreements (written or oral), or remained unaddressed. "Whether there was an integration as [Robert] contend[s] was a question of the intention of the parties on which proof could be received ranging beyond the writing proper." *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 849 (1973). *Fred S. James & Co. of New England, Inc.* v. *Hoffmann*, 24 Mass. App. Ct. 160, 163 (1987).

"A fully integrated agreement is a statement which the parties have adopted as a complete and exclusive expression of their agreement." *Starr* v. *Fordham*, 420 Mass. at 188 n.8, citing Restatement (Second) of Contracts § 210(1) (1981). Such an agreement will typically contain an "integration clause" stating that it constitutes the parties' sole agreement and that there are no oral or written representations outside of the agreement. See, e.g., *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496 n.6 (1997).

That the agreement governs only subject matter raised by Caroline's modification complaint[10] suggests that the agreement was intended to address solely those matters and not other subjects of dispute between the parties, and further supports the judge's finding. The agreement states that it was to be "final" on the issues of alimony, child support, private grammar and high school education costs and medical expenses. There were

---

[10]As amended, the complaint requested additional support on the basis that costs related to the children's living and education expenses had increased while Robert's financial situation had improved and Caroline's had declined. Caroline also asked that Robert "require the Trustee [Robert] of the Clifford Trust to live up to the spirit of the Trust and use the income generated by that Trust towards the children's education," and that Robert be required to maintain certain health insurance benefits that the divorce judgment ordered him to provide. Because the parties' Vermont property still had not been sold as the judgment required, Caroline asked that Robert be ordered to sell it within six months.

other, ongoing obligations of the parties arising from their former marriage and their relationship as parents that were not the subject of the agreement but continued to be governed by provisions in the original divorce judgment. For example, all issues of custody and visitation, those related to the division of property (including aspects of that division subject to future conditions), the right of occupancy of the marital residence, and the obligation to maintain health insurance all continued to be governed by the divorce judgment, and were not made the subject of the 1985 agreement. In addition, the parties' understanding that the first $14,000 of private school costs was to be paid using the children's trust income was extrinsic to the 1985 written agreement.[11]

Finally, the conclusion that omission of any provision for payment of college expenses was not a reflection of the parties' agreement that neither was to be obligated to pay such costs is supported by Robert's refusal to discuss the issue when the agreement was being negotiated.

Our decision in *McCarthy* v. *McCarthy*, 36 Mass. App. Ct. 490 (1994), may be distinguished from the facts of this case. There we decided that a separation agreement made at the time of the parties' divorce that was silent as to which parent would pay the children's college expenses, reflected the parties' "cho[ice] not to obligate themselves on the matter of higher education expenses." *Id.* at 491-492. We concluded that a modification of that agreement was not warranted in the absence of countervailing equities, a standard Robert seeks to apply to the facts of his case. Significant to our decision in *McCarthy* were two factors not present here: at the time the *McCarthy* agreement was executed, college was "on the horizon," *id.* at 491, for their fifteen year old, the eldest of the children; and both parents in that case were without assets, had modest incomes, and thus did not have the ability to pay for their

---

[11]Robert asserts that it was Caroline's "own obligation under the 1985 Stipulation to pay for the first $14,000 of such expenses," but he makes no claim of error with respect to the judge's finding that, although the document is "silent regarding responsibility for payment of the first $14,000 of [private school] educational costs," this was in order to avoid the income being taxed to the donor, and "the Trust income was . . . to be available for payment of [such] educational costs."

children's college costs. Thus, the decision did not, by concluding that neither party had the legal obligation to pay for college, impose a de facto burden to pay such costs upon the parent most desirous of financially assisting a child's college attendance.

Because the 1985 agreement did not address payment of the children's college costs, and was not an integrated agreement, the trial judge could consider whether there had been a material change in the parties' circumstances since the divorce justifying modification of the divorce judgment.

(b) *Material change in circumstances.* The divorce judgment made no provision for payment of the children's college costs because at that time the children were not yet eighteen, see note 9, *supra,* and no other factors were present supporting an order for this future obligation, *Passemato* v. *Passemato,* 427 Mass. at 54. Modification was proper upon a finding that a material and substantial change in the circumstances of the parties had occurred and the judgment of modification was necessary in the best interests of the children. G. L. c. 208, § 28. *L.W.K.* v. *E.R.C.,* 432 Mass. at 451. "In determining whether there has been a material change in the parties' circumstances, the probate judge must weigh the relevant circumstances; the resolution of the various factors rests with the judge's sound discretion. Unless there is no basis in the record for the judge's decision, we defer to the judge's evaluation of the evidence presented at trial." *Bush* v. *Bush,* 402 Mass. 406, 411 (1988) (citations omitted).

That one of the children had reached college age, and both wanted to attend college and were preparing to do so, constitutes a change in the circumstances of the parties in this case warranting modification of the divorce judgment. The order making Robert responsible for all such expenses, and requiring that he reimburse Caroline directly for her contributions and that he assume loans she obtained or guaranteed (some $116,029 in all, exclusive of interest), is supported by findings, summarized in the margin,[12] that Robert's financial resources are vastly superior

---

[12]In addition to nearly $117,000 in annual income from earnings and family trusts, Robert is the sole lifetime beneficiary of the Powell Cabot Trust (valued

to those of Caroline.[13] We therefore need not address Robert's claim that improvement in Caroline's financial circumstances, based on the increased value of the marital home and decreased expenses due to cessation of her obligation to pay the children's education expenses, negates her claim of changed circumstances. In any event, the increase in the home's value benefited the parties equally, and the significant increases in Robert's financial worth since the divorce,[14] well above any increase attributable

at $983,315), under which the trustees have discretion to pay principal and income to Robert for any reason. Apart from a request for $75,000 made in 1975 to purchase seventy acres of land in Blue Ridge, Georgia, Robert has made no request for a distribution of principal; in 1996 and 1997, however, he borrowed a total of $87,000. In 1995, he sold half the land in Blue Ridge for $79,000 and, in 1996, built a house on the remaining land. Robert places a $130,000 value on this unencumbered parcel of improved real estate.

Robert is also the sole lifetime beneficiary of the Virginia Cabot Trust, which is valued at $679,526, under which the trustees have discretion to pay principal and income to Robert or his issue. This trust holds a $175,000 mortgage on Robert's home in Roswell, Georgia, where he resides with his current wife, and which is not otherwise encumbered. Interest on the mortgage is paid by the trust. He places a value on this residence of $200,000.

Robert also holds an interest with other family members in island property off the coast of Maine, and a one-half interest in the former marital residence.

[13]The judge found that, by the time Caroline filed the complaint for modification in 1990, she had depleted her securities portfolio (which, according to Caroline's financial statement, had a value of $196,659 at the time of divorce), sold much of her personal property of value, and incurred significant debt largely in order to fund the children's education expenses. By the time of trial, Caroline had contributed $23,615 in payment of the children's college expenses. In addition, she obtained loans in her own name that have an outstanding principal balance of $51,359. She guaranteed payment of loans obtained by her daughter in the amount of $25,964 and similarly guaranteed loans obtained by her son in the amount of $15,091. Caroline's total annual income was $15,500 per year at the time of trial (alimony payments having apparently ceased when the parties' son graduated from college, see notes 3 and 8, supra).

[14]On the financial statement filed at the time of the divorce, Robert listed the value of his assets (exclusive of the marital home and personal property that the parties had divided between them) as being $361,764; in addition, he described an interest in the Powell Cabot Trust, which he valued at $407,460.80, as "contingent, remote and speculative" and subject to restraints on alienation, and therefore "it has been excluded as an asset in determining the husband's net worth."

In addition to finding that the value of the trust had more than doubled, and that trustees of the trust have the discretion to pay Robert, as sole lifetime beneficiary, principal or income for any reason, see note 12, supra, the judge

to his interest in the former family home, warrant the judge's order.

There is no merit to Robert's claim that the judge was without authority to order payments for education support because, by the time judgment entered, the children had become emancipated. The case on which Robert exclusively relies to support his argument, *Gediman* v. *Cameron*, 306 Mass. 138 (1940), is inapposite.[15] First, it was an appropriate exercise of the judge's discretion to make the obligation retroactive. *Boulter-Hedley* v. *Boulter*, 429 Mass. 808, 809 (1999) ("there is no statutory mandate that modification of support orders be given retroactive effect; the decision whether to give retroactive effect to such orders rests in the sound discretion of the judge"). Second, in October, 1990, when Caroline filed her complaint (in which she sought college contributions commencing in September, 1992), the children were seventeen and fifteen years old and just beginning the college selection and application process. By the time judgment entered, each child had reached the age of eighteen, triggering the court's authority to issue orders relative to education. See note 9, *supra*.

Of passing interest is Robert's claim that he should have been permitted to introduce evidence of the value of a painting that Caroline, during the marriage, had transferred into a trust for the children's benefit (the Caroline Cabot Children's Irrevocable Trust), and that the judge should have considered the

also found Robert failed to disclose, in financial statements filed with the court during proceedings in 1985 and 1990, that he was entitled to discretionary distributions of principal as well as of income. "He only made reference to the Trust income, each time stressing that the payment of that income was discretionary and managed by independent trustees. It is clear from all of the evidence that Robert has received income from the Trusts each year without exception and that he has never been refused by the trustees when he sought direct access to those funds either as a distribution of principal or as loans."

[15]*Gediman* dealt with the claim of a former wife against the estate of her former husband, made upon his death when their child was twenty-five years old. The wife had obtained a divorce many years earlier, but no order for child support. The court stated that statutes authorizing child support operate prospectively, and "do not justify orders or judgments made after the death of a necessary party, operating retroactively." *Gediman* v. *Cameron*, 306 Mass. at 141. But see *L.W.K.* v. *E.R.C.*, 432 Mass. at 450-451 (child support obligations survive death of a parent and judge has authority, posthumously, to modify such obligation).

children's remainder interests in two other trusts, as to which Robert is the sole lifetime beneficiary, see notes 12 and 14, *supra*. Because he offers no citation to authority to support his argument, we do not address it.[16] Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

We see no error in the order obligating Robert for college costs retroactive to the date his daughter commenced college, in September, 1992.

(c) *Relief.* The modification judgment (as does the contempt judgment, see *infra*) gives Caroline the option of setting off the amounts due from Robert under both the modification and contempt judgments against his interest in the former marital home, and of purchasing Robert's remaining interest. There is no merit to Robert's claim that this was an impermissible modification of a prior division of marital assets.[17]

The order neither alters the amount of Robert's one-half interest in the former marital home, nor changes the nature of his interest (which would, upon sale of the property, have been cash), and he points to no prejudice befalling him as the result of the order. There was no abuse of discretion in the judge's exercise of her broad equitable powers to fashion appropriate remedies. Cf. *Pare* v. *Pare*, 409 Mass. 292, 301 (1991) (probate judge has discretion to order that husband's child support arrearages be paid out of his interest in former marital residence); *Rosenberg* v. *Merida*, 428 Mass. 182, 189-190 (1998) (father's assets in bank account may be attached to secure child support obligation).

---

[16]It may well be that a judge ought to consider a child's available income or assets in deciding the amount of education support to be paid by a parent. See *L.W.K.* v. *E.R.C.*, 432 Mass. at 453 (citing legislative intent that "awards for educational support be reserved for those cases where an award would meet the current needs of the child"). If the judge did so here (her findings do not indicate whether she did), she no doubt also considered that the painting was to be held in trust until the youngest child reached age thirty. The judge's findings specifically reflect her consideration of the children's remainder interests in the two trusts, and the fact that, as sole lifetime beneficiary of these trusts, the trustees could in their discretion distribute all principal and income to Robert.

[17]Parties to a divorce may not relitigate the division of property that already has been the subject of a proceeding under G. L. c. 208, § 34, see *Bush* v. *Bush*, 402 Mass. at 409, but this has not occurred here.

2. *The contempt judgment.* The 1985 modification judgment required the parties to pay their respective shares of the proceeds from sale of the Vermont real estate into the children's trust. It ordered Robert, as trustee, to maintain the principal of this trust in "high income producing securities consistent with the manner in which the funds have been maintained in the past and shall exercise his discretion to this end consistent with the duties he owes as trustee," and to "pay to the beneficiaries of the said Clifford Trust [children's trust] the entire net income annually in accordance [with] Article First, Paragraph A of said Trust."[18] To the extent that the children's "education costs" exceeded the total of $14,000, the parties agreed they would each pay one-half of the excess.

There is ample support in the record for the judge's detailed findings to the effect that Robert persistently disregarded clear and unambiguous orders contained in that judgment, and for the conclusion that Robert was in contempt of the 1985 modification judgment. *Bisienere* v. *Buccino*, 36 Mass. App. Ct. 749, 753 (1994) (there must be a clear and unequivocal command and an equally clear and undoubted disobedience to support finding of civil contempt).

We summarize the judge's findings, supplemented by occasional uncontroverted facts from the record where they assist to amplify the circumstances.

(a) *Change in investment strategy.* The annual income generated by the children's trust was to pay the first $14,000 of the children's pre-college education costs. Projections that the trust income would likely yield something close to this amount were based on the anticipated addition to trust assets of the proceeds from sale of the Vermont property, and the expected return on these proceeds in combination with existing assets (values at the time ranging between $38,000 to $42,000), based upon prior investment in high yield corporate bonds. To the extent that projections did not meet expectations, Caroline was solely responsible for the difference; if private school costs exceeded

---

[18]Pursuant to this provision, "The trustee shall pay or apply the net income from the trust to or for the benefit of the child of the Donor in respect of whom the trust was created (hereinafter referred to as the beneficiary), annually or at more frequent intervals, during the term of the trust."

$14,000 annually, the parties would each pay one-half of the excess.

On December 1, 1986, Robert transferred the entire principal of the children's trust, then $42,593.98, from a high yield corporate bond fund to a short term municipal bond fund, where it remained through 1994. The judge did not credit Robert's justification for this change, noting that it was based on "his speculation about a change in the economic and investment environment in 1986," and that the market change occurred in 1989 but that "by 1991 the market had come back." Instead, she found that Robert's objective in changing the investment strategy was to benefit himself, by "preserv[ing] principal for its ultimate return to him." The change substantially reduced the income generated by the children's trust, causing Caroline, in making up the shortfall, to become obligated for a greater share of the children's education expenses up to $14,000.

These findings are supported by the evidence, and in turn support the conclusion that Robert caused a change in investment that was in violation of the order that he cause children's trust assets to be maintained in high yield investments, consistent with the trust's objective.

(b) *Failure to fund the trust.* The Vermont property sold in June, 1988, for an amount somewhat less than the parties had projected; each party was entitled to $15,841.46. Without Caroline's knowledge or consent, Robert instructed his attorney, who handled the closing, to deposit the entire sale proceeds into a certificate of deposit, resulting in a six-month delay in distribution to Caroline of the proceeds and the $1,137.46 in interest earned on that deposit. By that time private school tuition and expenses in an amount exceeding $19,000 were past due. Robert had not paid his share of those expenses over $14,000 since 1985 (see discussion, *infra*). He had also failed to deposit his share of proceeds into the children's trust, had changed the trust's investment strategy, and as a result the trust was not generating income sufficient to cover the first $14,000 in expenses. The judge determined that Caroline "needed [to use the funds] to immediately pay past due [private school expenses]," in essence excusing her failure to deposit the funds in the trust, without similarly excusing Robert. "[T]he question

whether to deny relief on the basis of the plaintiff's conduct [is] a matter committed to the broad discretion of the judge." *Fales* v. *Glass*, 9 Mass. App. Ct. 570, 575 (1980), citing *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Mach. Co.*, 324 U.S. 806, 815 (1945). *MacCormac* v. *Flynn*, 313 Mass. 547, 550 (1943). There was no abuse of discretion.

When Robert received his share of sale proceeds, he briefly deposited the funds in the children's trust only to withdraw the funds four months later to make an investment in stock. He realized a gain from the sale of stock in the amount of $3,795, which he failed to distribute to the children to defray their school expenses, retaining for himself both the capital gain and principal and distributing only the $856 dividend.

Robert's self-serving change in investment strategy, together with his failure to fund the children's trust with his share of the Vermont sale proceeds, caused a substantial loss in income to the beneficiaries, and ultimately to Caroline, who had to make up the deficit for private school expenses. Caroline liquidated at least half of her investments to make up the deficit, thereby significantly diminishing her assets and potential investment income, while also incurring capital gains taxes.

The judge was entitled to credit testimony of Caroline's expert regarding the amount of after-tax income that would have been generated by the children's trust assets had the funds remained in high yield investments, which she found would have totaled $45,799.90.

(c) *Failure to make timely payments*. Robert challenges the court's finding that he failed to make timely and complete payments of his share of the children's private school educations, arguing that the order that he pay "educational costs" is ambiguous and that, because the order did not provide a date for compliance, he was obligated only to pay within a reasonable time, which he maintains he did.

The relevant provision is set out below:

> "The parties agree that to the extent that the educational costs of both of the children of the parties exceed the total sum of $14,000 per year *as evidenced by bills from the educational institutions* in which the children are in at-

tendance, the parties shall divide such excess equally"
(emphasis supplied).

The obligation that the parties share such costs as are
"evidenced by bills from the educational institutions" is clear.
Robert never sought judicial clarification of the term, but simply
excluded from his share of expenses amounts listed on the bills
which he unilaterally deemed not his responsibility (including
tuition insurance, transportation, late fees, and lunch). Robert's
repeated failure to pay his share of all items set forth on state-
ments issued by the schools each child attended was a violation
of the order.

Robert regularly received notice of all the amounts to be paid
by him, both from Caroline and from the various schools at-
tended by his children. If he had thought that the agreement did
not clearly define the time within which his obligations were
due to be paid, the proper remedy would be for Robert to have
brought an action asking for clarification of the order. *Stabile* v.
*Stabile, ante* 724, 727 n.3 (2002), citing *Judge Rotenberg Educ.
Center, Inc.* v. *Commissioner of the Dept. of Mental Retardation
(No. 1)*, 424 Mass. 430, 451 (1997). Even under a generous
interpretation of what constitutes a reasonable period of time
within which such payments ought to have been made,[19] Robert
was in violation of his obligation. *Charles River Park, Inc.* v.
*Boston Redev. Authy.*, 28 Mass. App. Ct. 795, 814 (1990)

---

[19]By the end of the 1988 school term, Robert had made no payment toward
his $5,581 share of expenses incurred since the 1985 agreement was signed.
By 1990, the unpaid portion of his share of expenses had reached $18,364. It
was not until Caroline filed the complaint for contempt in March, 1990, that
he paid his full share of expenses for that year, and all but $1,576 of the past
due amounts. For the period commencing with the 1985-1986 school year
through the 1991-1992 school year, Robert's one-half share of expenses was
$26,566.50, of which he paid $21,416.54.

A temporary order issued on September 1, 1992, ordering Robert to pay his
son's past due tuition in the amount of $6,520.45. Robert made the payment
using his son's Uniform Gift to Minors Act account. The temporary order also
required Robert to pay all of his son's senior year tuition. Robert gave the
school a $10,000 note secured by stock; he withdrew the pledge prior to
maturity without informing the school. When the school threatened collection
proceedings, he made payments over a several year period ending in 1995,
although he had sold the stock in 1992 at an amount well in excess of the
funds due.

("What is a reasonable time depends on the nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances").

There was no error in the judge's finding that there was no justification for Robert's failure to make timely payments and that he had wilfully violated the 1985 modification judgment.

(d) *Relief.* Robert challenges the amounts the court ordered him to pay as not supported by the evidence.[20] He was ordered to pay $45,799.90 for the loss of income that would have been generated by the children's trust had Robert not, contrary to the parties' agreement, altered the investment strategy of that trust; $14,133.98 as a reimbursement to Caroline for her share of the children's pre-college tuition fees in excess of $14,000, for the period from March 1990 through 1993[21]; and $7,298, representing one-half of her capital gains taxes, which the judge attributed to liquidation of that portion of Caroline's securities portfolio used to pay the children's pre-college educational expenses.

The judge's findings as to these amounts are supported by the evidence. Further, the awards were within the judge's broad discretion to make. See *Patten* v. *Mayo*, 23 Mass. App. Ct. 657, 662 (1987) (Probate Court jurisdiction includes authority to award damages).

3. *Power to rescind the 1985 agreement.* Caroline's claim for rescission is "based on Robert's complete failure of performance," and not upon fraud, accident, mutual mistake, undue influence, or failure of consideration. See Nolan & Sartorio, Equitable Remedies § 403 (2d ed. 1993).[22]

Rescission is available when a contract has been abrogated.

---

[20]He also claims, as he did with respect to the modification judgment, that the order impermissibly modifies the property division ordered by the parties' judgment of divorce. For the reasons we discussed, *supra*, there was no error.

[21]Robert does not challenge the judge's order that "[a]s a further remedy for Robert's breach, the 1985 Modification Judgment shall be modified back to the date Caroline filed the Complaint for Contempt in March, 1990, in that Robert shall pay Caroline's one-half of the excess over $14,000." We have noted that "[i]n limited circumstances, modifications may . . . be made pursuant to a complaint for contempt." *Ruml* v. *Ruml*, 50 Mass. App. Ct. 500, 509 n.14 (2000), citing *Williams* v. *Massa*, 431 Mass. 619, 636-637 (2000).

[22]The parties raise no issue regarding the authority of the Probate Court, under general principles of equity jurisprudence, to rescind an agreement that

*Worcester Heritage Soc., Inc.* v. *Trussell,* 31 Mass. App. Ct. 343, 345 (1991). See *Runkle* v. *Burrage,* 202 Mass. 89, 99 (1909) ("nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party"). "There is ample authority for refusing rescission where there has been only a breach of contract rather than an utter failure of consideration or a repudiation by the party in breach." *Worcester Heritage Soc., Inc.* v. *Trussell, supra* at 345. Cf. *Rezendes* v. *Rezendes,* 46 Mass. App. Ct. 438 (1999).

Nothing in the record indicates that Robert breached provisions in the 1985 agreement regarding support and payments for uninsured medical expenses. The judge used the full power of her discretion to remedy the effect of Robert's breaches on Caroline. The denial of this request was not erroneous.

4. *Conclusion.* We affirm the judgments. Caroline may submit her petition for appellate fees together with the necessary supporting material within fifteen days of the issuance of the rescript in this case. *Yorke Mgmt.* v. *Castro,* 406 Mass. 17, 20 (1989). Robert shall have fifteen days thereafter to file a response. Caroline's request for double costs and attorney's fees[23] is denied as not all of Robert's appellate arguments can be said to be without reasonable basis in fact or law.

*So ordered.*

---

has been incorporated in a judgment entered pursuant to an action for divorce. We will assume, without deciding the issue, that it has such authority. See, e.g., *Beaton* v. *Land Court,* 367 Mass. 385, 392 (1975) (stating "that a court acting under general principles of equity jurisprudence has broad power to reform, rescind, or cancel written instruments . . . on grounds such as fraud, mistake, accident, or illegality").

[23]The request, made pursuant to G. L. c. 211, § 10, is unavailable under that statute, but is available under G. L. c. 211A, § 15, which mirrors it. *Avery* v. *Steele,* 414 Mass. 450, 454 (1993).